**COLUMBIA MEDICAL CENTER OF LAS COLINAS, INC. d/b/a Las Colinas Medical Center, Petitioner,**

v.

**Athena HOGUE, Individually and as Executrix of the Estate of Robert Hogue, Jr., Deceased, Christopher Hogue, and Robert Hogue, III, Respondents.**

No. 04–0575.

Supreme Court of Texas.

Argued April 12, 2005.

Decided Aug. 29, 2008.

Rehearing Denied Jan. 16, 2009.

---

Diana L. Faust, R. Brent Cooper, Devon J. Singh, Cooper & Scully, P.C., Brad M. LaMorgese, McCurley, Orsinger, McCurley, Nelson & Downing, Dallas, Kevin L. Wentz, Glynis L. Zavarelli, Wentz & Zavarelli, LLP, Irving, TX, for Petitioner

Melvin H. Wolovits, Law Offices of Melvin H. Wolovits, P.C., Mark S. Werbner, Sayles/Werbner, P.C., Eric D. Pearson, Heygood Orr Reyes Pearson & Bartolomei, and Joshua Bernstein, Miller Curtis & Weisbrod LLP, Dallas, TX, for Respondent.

Justice WAINWRIGHT delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice O'NEILL, Justice BRISTER, Justice MEDINA, Justice JOHNSON, and Justice WILLETT joined, and in Parts II–A, II–C, and II–D of which Justice HECHT and Justice GREEN joined.

This is a medical malpractice case. In this appeal, it is undisputed that the hospital caused Bob Hogue's death. The jury made that finding at trial, the hospital does not challenge it in this Court, and the dissenting justices acknowledge that the evidence supports that finding. The primary issue presented to this Court is whether sufficient evidence was admitted at trial to support the jury's finding that the hospital was also grossly negligent in causing Hogue's death.

On Monday, March 2, 1998, a seemingly healthy Bob Hogue had dinner with his college-aged sons in Texas before traveling to Albuquerque, New Mexico for business. One week later, doctors struggled unsuccessfully to save his life as his organ systems failed. His widow and sons brought this medical malpractice action against the hospital to which Bob Hogue was initially admitted. The jury found the hospital negligent and grossly negligent and awarded over $30 million in actual and exemplary damages. The trial court reduced the exemplary damage award per chapter 41 of the Texas Civil Practice and Remedies Code. The court of appeals affirmed the trial court's judgment on exemplary damages but concluded that the Medical Liability and Insurance Improvement Act capped actual damages and reduced the total damages award to under $5 million. 132 S.W.3d 671.

The hospital petitioned this Court for review, challenging (1) the trial court's submission of the patient's contributory

negligence in an unusual third phase of the trial separate from the general liability question, (2) the legal sufficiency of the evidence of the defendant's gross negligence, (3) the legal sufficiency of the evidence to support loss of inheritance damages, and (4) the application of the pre-2003 version of the pre- and postjudgment interest statutes to this case. Because the hospital did not present legally sufficient evidence of contributory negligence, we do not decide whether the unusual submission of the contributory negligence question was error. We hold that the Hogues presented clear and convincing evidence on which a jury could reasonably conclude that the hospital was grossly negligent. We also hold that there is no evidence of loss of inheritance damages, and we conclude that the 2003 amendments to the Texas Finance Code, concerning interest on judgments, do not govern this case. Therefore, we reverse the loss of inheritance damages, and affirm the remainder of the judgment.

## I. Factual and Procedural Background

After dinner with his wife on Thursday, March 5, 1998, Bob Hogue complained that he had an upset stomach and felt a little dizzy. The next morning, he felt tired. Thinking he might have caught the flu and may not recover in time for scheduled business travel on Monday, Hogue's wife Athena suggested he see a doctor. Dr. Jay Story, who had never before examined Hogue, examined him around noon that day. Dr. Story diagnosed Hogue with pneumonia and prescribed some medicine. Dr. Story also asked Hogue to schedule a follow-up appointment for Monday morning before Hogue left town.

Hogue took the medication Dr. Story prescribed, but his symptoms continued through the weekend. On Sunday eve-ning, Hogue's wife called Dr. Story's office, concerned because Hogue coughed up pink-tinged phlegm. The on-call doctor instructed her to take her husband to the emergency room if his condition worsened, but otherwise just to return to Dr. Story's office in the morning. By Monday morning, Hogue's condition had worsened. The Hogues traveled to Dr. Story's office early and requested to see a doctor immediately. Dr. Story x-rayed Hogue's chest, advised him that his lungs were infiltrated with fluid, and dispatched him to Columbia Medical Center of Las Colinas by ambulance. Dr. Story then called Columbia Medical and alerted the emergency room (ER) doctor, Dr. Gregory Blomquist, that he was sending over a patient he had diagnosed with pneumonia. Dr. Story advised Dr. Blomquist that he did not have a medical history for the patient.

Shortly after 9:00 a.m., Dr. Blomquist met the Hogues at the emergency entrance. Hogue was conscious but was in severe respiratory distress, breathing approximately once every second. Dr. Blomquist recognized that Hogue was seriously ill. While beginning his physical exam of Hogue, Dr. Blomquist asked Hogue basic questions about his symptoms and medical history. Hogue replied in the negative to questions about chest pain, family history, and risk factors for heart disease, such as smoking, high cholesterol, or high blood pressure. Hogue also "denie[d] any symptoms except shortness of breath [for the preceding] three days, and a slight cough." In response to a question about having previously experienced similar symptoms, Hogue answered, "I've always been healthy." No one told the health care providers that Hogue had been previously diagnosed with a heart murmur, even though in September 1996 Hogue reported a history of a heart murmur during a routine physical exam. His family doctor, Dr. Richard Honaker, had confirmed the

existence of a heart murmur and recommended a follow-up with a cardiologist, which never occurred.

While questioning Hogue, Dr. Blomquist also evaluated his physical condition. Hogue was sweating and struggling to breathe. He had a blue tint around his mouth, his fingernails, and his other extremities, indicating that Hogue was not exchanging oxygen well. Dr. Blomquist's physical exam revealed a tachycardic (fast) heart rate, occasional skipped heartbeats, and an abnormal, extra heart sound in each heartbeat, but Dr. Blomquist detected no heart murmur. Dr. Blomquist ordered an electrocardiogram (EKG) and blood tests designed to identify acute heart injury markers. The results from these tests were negative.

Within minutes of Hogue's arrival, Dr. Blomquist called Dr. Timothy Schroeder, a critical care pulmonary specialist and director of the intensive care unit (ICU) at Columbia Medical. Dr. Schroeder was not at Columbia Medical because he was seeing patients at another hospital. During the conversation, Drs. Blomquist and Schroeder agreed that Dr. Blomquist would "stabilize [Hogue] and make sure he was on a breathing machine, make sure we tried to get his oxygenation up, make sure we got labs set up, those types of things." Dr. Blomquist then intubated Hogue and placed him on a ventilator.

By approximately 11:10 a.m., Dr. Blomquist had stabilized Hogue for transfer to the ICU and paged Dr. Schroeder to inform him. Within a half hour, Dr. Schroeder returned the page and agreed that Hogue would be admitted to the ICU under Dr. Schroeder's care. Around 12:30 p.m., Dr. Blomquist transferred Hogue to the ICU.

Dr. Schroeder arrived in the ICU between 1:10 and 1:30 p.m. and began his evaluation and examination of Hogue. Dr. Schroeder conducted a number of tests, including one that identified abnormal chest pressures in Hogue's pulmonary arteries. Dr. Schroeder contacted cardiologist Dr. John Lawson for help interpreting some of this data. By the end of the telephone conversation, the doctors decided that a consult was necessary. Although Dr. Lawson was also not on-call at Columbia Medical that day, he agreed to evaluate Hogue after he attended to his patients at other hospitals. He did not specify a time. After conferring by phone with Dr. Lawson, around 3:35 p.m., Dr. Schroeder ordered an echocardiogram (echo) of Hogue's heart "now," which he testified is equivalent to "stat." Columbia Medical's list of medical abbreviations defined "stat" as immediately. An echocardiogram, which is a cardiac ultrasound that produces images of the heart, is different from an EKG, which graphically records the electrical activity of the heart. CECIL ESSENTIALS OF MEDICINE 47, 55 (Thomas E. Andreoli, M.D. et al. eds., 6th ed.2004).

The hospital also played a prominent role in Hogue's treatment. Although Columbia Medical did not have in-house echo services, the hospital had contracted for those services from a third-party vendor, but declined to exercise an option to guarantee an expedited response time for echocardiographic studies. Dr. Schroeder ordered the stat echo at 3:35 p.m., but the radiology department did not page the outsourcing echo service until approximately 4:10 p.m. The echo technician returned the page within twenty minutes and discussed the doctor's order with an ICU nurse. The technician was informed that a stat echo had been ordered, but he testified that he was not given the impression that Hogue needed urgent attention; rather, the ICU nurse stated that Hogue was stabilized on a ventilator and that his condition was not heart-related. The techni-

cian arrived shortly after 6:00 p.m., set up the echo equipment, and began the study. He immediately identified a severe leakage of Hogue's mitral valve and interrupted the study to alert a nurse. He finished the study around 6:30 p.m., approximately three hours after the stat echo was ordered. The technician observed that at least

> one leaflet of the mitral valve was almost completely unhinged and what we call flailed, meaning that it's just flopping around in a breeze with nothing to hold it in place.... And also, the size of some of the chambers on [Hogue's] heart in proportion to his body size suggested to [the tech] that this was an acute event and not something that had been around a long time.

Based on the technician's findings, cardiologist Dr. Phillip Hecht, one of Dr. Lawson's partners, was called. Dr. Hecht determined that Hogue required emergency surgery to repair his mitral valve and needed to be transferred immediately to Baylor Irving Hospital. After Dr. Hecht ordered the transfer at approximately 7:45 p.m., it took Columbia Medical an additional 20–25 minutes to arrange for the ambulance transfer to Baylor Irving. Shortly after arriving at Baylor Irving at 8:46 p.m., more than two hours after the echo study was completed, Hogue coded, and efforts to resuscitate him failed. Dr. Lawson arrived at Columbia Medical after Hogue's transfer to Baylor Irving.

Hogue's wife and their two sons sued Columbia Medical, asserting survival and wrongful-death claims,[1] and the case proceeded to trial in three phases. The first phase consisted of approximately two weeks of evidence and argument, after which the court charged the jury to decide

whether Columbia Medical was negligent in Hogue's treatment, and if so, whether it was grossly negligent. The jury returned a finding adverse to Columbia Medical on both questions and awarded the Hogues $9,196,155 in actual damages.

During the second phase of trial, the jury assessed punitive damages of $21,000,000 against Columbia Medical based on the gross negligence finding in the first phase. During the third phase of trial, the jury heard further argument but no additional evidence, and the trial court instructed the jury to consider whether Hogue contributed to his injury when he did not inform his treating physicians that he had been diagnosed with a heart murmur. The jury did not find that Hogue was contributorily negligent. The trial judge capped the punitive damages pursuant to chapter 41 of the Civil Practice and Remedies Code, but did not cap the actual damages pursuant to the Medical Liability and Insurance Improvement Act (MLIIA).

Columbia Medical appealed. The court of appeals reversed the trial court on the applicability of the MLIIA to actual damages, capped actual damages at $1,471,405.20, and affirmed the remainder of the trial court's judgment, including exemplary damages of $3,356,296. 132 S.W.3d 671. Columbia Medical petitioned this Court for review.

## II. Discussion

Columbia Medical asserts that the trial court committed reversible error by submitting the contributory negligence question in the third phase of trial instead of with the general liability question. We first consider whether contributory negli-

1. The lawsuit originally named several doctors and professional associations, but these defendants, by way of settlement, nonsuit, or summary judgment, are no longer parties to the suit.

gence should have been submitted to the jury.

## A. Contributory Negligence

In this case, the jury found Columbia Medical negligent because it failed to timely provide necessary services to diagnose Hogue. Columbia Medical asserts that Hogue was contributorily negligent for failing to disclose his previous heart murmur diagnosis. The Hogues counter that there is no evidence of causation or evidence that the hospital would have done anything different if it had known of Hogue's heart murmur. Therefore, they contend that failure to submit the contributory negligence question in the first phase of the trial was not error.

■ Admittedly, physicians at Columbia Medical began treating Hogue without the benefit of his complete medical history. The record indicates that Hogue failed to inform not only the doctors at Columbia Medical of his heart murmur, but also Dr. Story before Hogue was in acute medical distress. Dr. Story shared his tentative diagnosis of pneumonia with Dr. Blomquist at Columbia Medical. Failure to respond fully and accurately to a doctor's questions could hamper a doctor's diagnosis, could delay appropriate treatment, and in the proper case, might raise a fact issue concerning a patient's possible contributory negligence. *See Elbaor v. Smith,* 845 S.W.2d 240, 245 (Tex.1992) (recognizing a patient's duty of cooperation); *see also Jackson v. Axelrad,* 221 S.W.3d 650, 654 (Tex.2007) (discussing the duty of a patient to cooperate in his health care). But here, we need not identify the parameters of such a duty between lay patients and treating physicians. *Cf. Jackson,* 221 S.W.3d at 655–57 (observing that, for purposes of a contributory negligence inquiry in a medical malpractice case, a physician

patient's specialized knowledge may be relevant to the ordinary care standard).

■ Negligence arises when an actor breaches a legal duty in tort, and the breach proximately causes damages. *IHS Cedars Treatment Ctr. of DeSoto, Texas, Inc. v. Mason,* 143 S.W.3d 794, 798 (Tex. 2004); *D. Houston, Inc. v. Love,* 92 S.W.3d 450, 454 (Tex.2002). Assuming, without deciding, that Hogue owed and breached a duty to disclose his prior heart murmur diagnosis, Columbia Medical must present some evidence that Hogue's nondisclosure proximately caused his injury. Proximate cause includes both cause in fact and foreseeability. *Mason,* 143 S.W.3d at 798–99; *Love,* 92 S.W.3d at 454. Proximate cause cannot be satisfied by mere conjecture, guess, or speculation. *Mason,* 143 S.W.3d at 799; *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex. 1995). In particular, cause in fact requires that the allegedly negligent act or omission constitute "a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *Mason,* 143 S.W.3d at 799. Columbia Medical's proof of causation to support its contributory negligence submission must rise above mere conjecture or possibility. *See Mason,* 143 S.W.3d at 798–99; *Duff v. Yelin,* 751 S.W.2d 175, 176 (Tex.1988). Columbia Medical claims that Hogue negligently failed to disclose his heart murmur and that Hogue's omission delayed proper treatment by the physicians.

■ There is no evidence that the diagnosing doctors at Columbia Medical would have acted differently if Hogue had disclosed his heart murmur diagnosis. Dr. Blomquist, the ER doctor, testified that, if Hogue had disclosed his heart murmur diagnosis, it "would have *perhaps* moved a cardiac source higher" on his differential diagnosis and he "would have searched *perhaps* more diligently for a cardiac

source" of the illness. (Emphasis added). Dr. Blomquist's testimony further suggests that even if a cardiac source had been higher on his differential diagnosis, he would not necessarily have behaved differently:

> Q: And if you would have considered [a] cardiac cause higher on [your differential diagnosis], would that have meant you would have considered obtaining a consultation of a cardiologist?
>
> A: *Possibly.*
>
> Q: Would that have meant that you would have considered requesting an echocardiogram?
>
> A: *Possibly.* (Emphasis added).

"Perhaps" and "possibly" indicate conjecture, speculation or mere possibility rather than qualified opinions based on reasonable medical probability. *See Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 729–30 (Tex.1997) (stating that "can" and "could" do not indicate reasonable medical probability); *see also Gen. Motors Corp. v. Sanchez,* 997 S.W.2d 584, 591 (Tex.1999). While the specific words "reasonable medical probability" need not be used, the testimony must demonstrate conduct that to a reasonable degree of medical certainty would have occurred. *See Otis Elevator Co. v. Wood,* 436 S.W.2d 324, 331–32 (Tex. 1968). The testimony on causation proffered by Columbia Medical is insufficient to raise a question of fact on proximate cause.

In addition, the testimony of Hogue's second treating physician also fails to raise a question on whether Hogue's nondisclosure of a heart murmur diagnosis caused his injury. When asked if he would have wanted or needed information about a prior heart murmur, Dr. Schroeder responded that he did not ask for that information and that he would not have found that information useful in an initial history.

> Q: Would [the information that Hogue had previously been advised that he had a heart murmur] been the kind of information doctor, that you would have wanted to have included in or known about in Mr. Hogue's history?
>
> A: It's not something that I routinely ask about.
>
> Q: Okay. Would ... history of heart murmur ... be the kind of symptom that you as a critical care specialist would want to know about of a patient?
>
> A: ... I don't usually ask about heart murmurs, and that's not a bit of information that I would find useful in an initial history.

Because the physicians testified that knowing of Hogue's heart murmur would not have been useful or changed their course of treatment, there is no evidence that Hogue's nondisclosure of the condition caused his injury.

While the Hogues are correct that the physicians' opinions constitute no evidence of causation, they incorrectly imply that those statements are attributable to Columbia Medical. "A hospital is ordinarily not liable for the negligence of a physician who is an independent contractor." *Baptist Mem'l Hosp. Sys. v. Sampson,* 969 S.W.2d 945, 948 (Tex.1998). However, because Columbia offers no evidence of causation (other than to erroneously rely on the physicians' statements), Columbia Medical failed to support its position that nondisclosure of the heart murmur diagnosis in reasonable medical probability contributed to Hogue's injury. Thus, it was not error for the trial court to refuse to submit the contributory negligence question in the first phase of the trial. Although we do not approve of submitting contributory negligence to the jury in the third phase of trial, we need not reach the issue of whether this unusual approach in submitting the charge would constitute re-

versible error in a case warranting a contributory negligence submission.

## B. Gross Negligence

On appeal, Columbia Medical next challenges the legal sufficiency of the evidence supporting gross negligence. Columbia Medical does not, however, challenge the quantum of exemplary damages. *See* TEX. R.APP. P. 53.2(f) ("The petition must state concisely all issues or points presented for review."). The Hogues argued to the jury that Columbia Medical was grossly negligent in a number of ways, including Columbia Medical's failure to provide stat echo availability.[2]

■■■ Two elements comprise gross negligence. First, viewed objectively from the actor's standpoint, the act or omission complained of must depart from the ordinary standard of care to such an extent that it creates an extreme degree of risk of harming others. *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 784–86 (Tex. 2001); *Universal Servs. Co. v. Ung*, 904 S.W.2d 638, 641 (Tex.1995); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 21–22 (Tex. 1994); *see also Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326 (Tex.1993) (holding that gross negligence must involve an "objectively higher risk than ordinary negligence"). "Extreme risk" is not "a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff." *Moriel*, 879 S.W.2d at 22 (quoting *Alexander*, 868 S.W.2d at 327); *see also Harrison*, 70 S.W.3d at 785. And the risk must be examined prospectively from the perspective of the actor, not in hindsight. *Moriel*, 879 S.W.2d at 23. Second, the actor must have actual, subjective awareness of the risk involved and choose to proceed in conscious indifference to the rights, safety, or welfare of others. *Harrison*, 70 S.W.3d at 785; *Ung*, 904 S.W.2d at 641; *Moriel*, 879 S.W.2d at 23.

■■■ Gross negligence must be proven by clear and convincing evidence. TEX. CIV. PRAC. & REM.CODE § 41.003(a)(3); *see Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex.2004) (noting that "whenever the standard of proof at trial is elevated, the standard of appellate review must likewise be elevated"). Because of this heightened burden of proof, we apply a heightened standard of review:

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

*Diamond Shamrock Ref. Co., L.P. v. Hall*, 168 S.W.3d 164, 170 (Tex.2005) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002)).

---

2. The Hogues also argue that Columbia Medical was grossly negligent due to its failure to have an on-call list by specialty and for misleading advertising. For the reasons that follow, we need not reach these additional bases.

We review all the evidence in this case to determine whether the jury could have formed a firm belief or conviction that Columbia Medical's conduct deviated so far from the standard of care as to create an extreme risk and that Columbia Medical was subjectively aware of, but consciously indifferent to, this risk.

■ The Hogues argue Columbia Medical was grossly negligent in its decision not to provide echocardiogram services on a stat basis for its emergency medical services and in its failure to advise the physicians of the lack of stat echo capability. Columbia Medical asserts that there is insufficient evidence under the law that the failure to provide an echocardiogram on a stat basis created an extreme risk to others. We review all the evidence in the light most favorable to the jury's findings to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.

Before its opening in 1997, Columbia Medical determined that it would require echocardiographic capability to support its emergency department. Because it believed it would need a low volume of these essential services, however, Columbia Medical decided to outsource the echo services rather than provide them in-house. Scott Montgomery, Columbia Medical's Director of Clinical Outpatient Services, was responsible for negotiating a contract for these services. Montgomery testified that it was "obvious" and "elementary" that a hospital emergency department would need echocardiograms on a stat, or urgent, basis. However, it is undisputed that Columbia Medical did not obtain stat, or urgent, echo capability with its outside provider, nor did its contract guarantee a response time for echocardiographic studies. The contract with Cardiovascular On–Call Specialists for echo services included a "stat" fee of $85 for any procedure that

was ordered after hours (defined in the contract as after 5:00 p.m. and before 8:00 a.m., on weekends, or on holidays). In addition, the contract provided Columbia Medical with an option to guarantee a response time during certain time periods by paying an "on-call" fee of $3 per hour, in addition to the base fee for services. The contract did not guarantee a response time during business hours, and Columbia Medical did not exercise the option to guarantee a response time for echocardiographic studies. As a result, On–Call Specialists was under no obligation to provide echo services within a specified time period, and Columbia Medical elected not to ensure the provision of urgent echo services to its critical care patients, which stands in contrast to Columbia Medical's decision to obtain guaranteed response times for vascular studies from On–Call Specialists. Morton Graham, proprietor of On–Call Specialists, called Montgomery on a couple of occasions to discuss the guaranteed response option for echo studies, but Montgomery appeared uninterested and never engaged those services until after Hogue's death. In addition, Graham explained that Montgomery never inquired what response time could be expected under the contract, and Montgomery acknowledged that he never consulted any physician concerning what an appropriate response time would be.

Dr. Ira Korman, Columbia Medical's expert and professional consultant on hospital administration, testified that there is no requirement that a hospital provide echocardiography services, nor a requirement that if a hospital does provide such services, that the hospital must provide the services within a certain period of time. He also opined that Columbia Medical acting as a reasonably prudent hospital would, in the same or similar circumstances, enter into the contract for the provision of echo services, even though it

did not provide for services on an urgent basis. Dr. Korman's testimony was contradicted by the hospital. Montgomery, director of those services for Columbia Medical, testified that stat echo services were necessary at Columbia Medical. Although Montgomery testified that the medical staff had reported that they were satisfied that patient care needs were being met under the contract, he admitted that he did not know if an echo had been needed on a stat basis from the August 1997 opening of the medical center to the time of Hogue's treatment in the emergency department at Columbia Medical.

Peter Bastone, the Hogues' expert on the hospital's standard of care and Chief Executive Officer of a hospital in California, testified that when a hospital contracts to outsource a patient service, "there should be specific guidelines in terms of how quickly that contracted service will come in and provide that service" and that "its staff need[s] to be aware of how to order this procedure." Similarly, Montgomery and Pat Sullivan, a registered nurse who was Columbia's Chief Operating Officer, testified that it was prudent and necessary for the hospital to have communicated to the physicians whether they would be able to get an echo on a stat basis. Furthermore, Montgomery testified that he did not inform Columbia Medical's medical staff that an echocardiogram could not be provided on a stat basis and that he was not aware if anyone communicated this information to them. In fact, both Drs. Blomquist and Schroeder (director of the ICU), physicians who treated Hogue, testified that they did not know that the echo services were outsourced or that there was no effective procedure to ensure the availability of echo services on a stat basis to treat their patients, prior to March 9, 1998. This vital information was not even contained in Columbia Medical's Health Care Plan, which Sullivan testified is the method by which the hospital communicates to the medical staff the capabilities the hospital has to support patient care.

There is some evidence that the nursing staff was informed before March 9, 1998 that echo services were outsourced, and Dr. Schroeder discovered that fact for the first time when he ordered the stat echo for Hogue on March 9. There is clear and convincing evidence that Columbia Medical had actual knowledge of the necessity for emergency echo services in this case, declined to make such services available, and failed to communicate the limitation on its echo services to the physicians or nursing staff. This evidence shines a different light on Montgomery's statement that the medical staff was satisfied that patient care needs were being met because the critical deficiency in the hospital's provision of necessary emergency medical capabilities did not become apparent to the treating physicians until it tragically manifested in Hogue's case.

When the evidence establishes the necessity for certain urgent services for critical care, the experts explained that the need may be met by timely transferring a patient to a nearby facility that provides the service. Bastone testified that "once the patient's assessed and hopefully stabilized, and it's knowledgeable that you don't have the technology or the specialist available to do the kind of intervention that's necessary, then transferring that patient as quickly as possible is key." The Hogues' causation expert, Dr. Sidney Levitsky, a cardiothoracic surgeon, Harvard Medical School professor, and senior vice chairman of the department of surgery at Beth Israel Deaconess Medical Center in Boston, also testified that, ideally, a patient should be transferred "as quickly as possible to the best facility able to take care of their illness, particularly, if the

local facility doesn't have the wherewithal to do it." In fact, Dr. Blomquist, one of Hogue's treating physicians, testified that he had an "obligation" to transfer a patient if he had determined that the hospital could not care for that patient. And Montgomery admitted that if a patient needed a stat echo, the patient should be transferred to another facility with stat echo capabilities. However, in this case, because the hospital did not communicate the hospital's inability to ensure the availability of emergent echo services, the physicians had no opportunity to adequately assess the risks and benefits of transferring Hogue to another hospital in lieu of waiting to obtain echo services.

The dissenting Justices suggest that the doctor who ordered Hogue's echo, Dr. Schroeder, was informed about the length of time it would take to get an echo and chose to wait rather than transfer Hogue or attempt to obtain diagnostic services elsewhere:

> Despite the echo technician having told Hogue's nurse that it would probably take up to two hours for him to get to the hospital, Dr. Schroeder's echo order remained in place, and Hogue's treating physicians chose to wait rather than immediately transfer Hogue to another hospital, which could have been done under the hospital's policies.

271 S.W.3d at 258 (Green, J., concurring and dissenting). The quoted passage implies that Dr. Schroeder was informed about the extent of the delay and exercised medical judgment in deciding to wait nearly three hours for the study, but that is contrary to the evidence at trial. The record shows that Dr. Schroeder appreciated both the gravity of the situation and that time was of the essence. When Dr. Schroeder phoned the radiology department to order the echo, he learned for the first time that echo services were out-

sourced and that a technician would have to be called in from another location. Given this information, Dr. Schroeder testified that he informed the radiology department that he wanted the echo "now." He testified unequivocally that he was never told when the echo could be expected. The evidence does not suggest that Dr. Schroeder was aware that it would take one hour for the hospital to communicate with the echo technician and another two hours to get the echo study. In fact, Dr. Schroeder testified that he expected to get an echo "within 30 to 60 minutes."

There is considerable other evidence in this case that such a significant delay was not expected. Indeed, all the evidence offered regarding the appropriate stat echo response time in this case establishes that Columbia Medical clearly breached the standard of care. Dr. John Lawson, the cardiologist who recommended the stat echo for Hogue, testified that, in his opinion, "stat" meant "within an hour or two." In addition, Montgomery testified that, as applied to an order for an echocardiogram, "stat" means that the "procedure needs to be prioritized higher than ... routine orders and it needs to be done as soon as possible," but that it would not necessarily be possible to perform an echo immediately. However, Montgomery acknowledged that Columbia Medical's internal list of abbreviated terms defines "stat" as "immediately." Bastone, the Hogues' expert on hospital administration, testified that the standard of care for stat echo response time is a thirty minute response. He opined that Columbia Medical's response time in this case fell below that standard. Dr. Levitsky, the Hogues' causation expert, testified that the emergency rooms and intensive care units he had been affiliated with had echo response times that ranged from fifteen to thirty minutes. He testified that the three hours it took to

obtain an echo study for Hogue was too long.

In terms of the degree of risk, experts testified that echocardiograms are ordered on a stat basis only when necessary, which is uncommon. However, Dr. Levitsky testified that it is still important to be able to perform an echocardiogram on a stat basis because "many times a patient's life is in immediate danger, or shortly will begin to decompensate if one misses the diagnosis." He testified that, in this case, Hogue would have had a ninety-percent chance of survival if he had been diagnosed and transferred to Baylor Irving earlier.

Experts for both the plaintiffs and the defendant testified that a health care facility that provides emergency cardiogenic services must have stat echo capability, whether provided by staff or on a contract basis. As previously detailed, several medical experts testified that the response time for a stat echo was fifteen to sixty minutes. Dr. Schroeder, the physician who primarily treated Hogue at Columbia Medical that day, testified that an echo on a stat basis should be obtained in under an hour. Columbia Medical's Director of Clinical Outpatient Services confirmed that stat echo ability was necessary for Columbia Medical's emergency department, and it was Columbia Medical's policy that a "stat" echo should be provided "immediately" or as soon as possible. Notwithstanding this knowledge, Columbia Medical elected not to secure echo capability on a stat basis, even after Morton Graham advised the hospital to do so on more than one occasion. Importantly, Columbia Medical failed to advise the physicians on staff that it did not provide echo services on an emergency basis. Because the hospital had not informed its emergency medical staff of the lack of stat echo capability, Hogue was without a timely, emergency echocardiogram at Columbia Medical and was not transferred to obtain one.

Furthermore, although the stat echo was ordered at 3:35 p.m., Columbia Medical's nurses did not call the echo technician service until 4:10 p.m. Morton Graham returned the call at 4:30 p.m., but advised the ICU nurse that he would not be able to arrive until approximately two hours later. After arriving at Columbia Medical shortly after 6:00 p.m., Graham explained, he had to spend time setting up the room to perform the echo. The stat echo study was not completed until 6:30 p.m., three hours after the emergency echo was ordered.

 Columbia Medical argues that the inability of the on-call service to respond sooner than the two-hour guaranteed response time option provided in the contract negates proximate causation. We disagree. Graham affirmed that if Columbia Medical had wanted stat echo capabilities, he would have been willing to negotiate terms for an urgent response time, but Columbia Medical was not interested in guaranteeing a response time.[3] Although Graham provided a two-hour response option, Columbia Medical did not exercise that option. Nevertheless, Graham testified that (1) he actually got to the hospital within two hours of being paged in Hogue's case, which is all he would have been able to guarantee under the terms of the contract, and (2) he could not have gotten there any sooner on that day. Graham made it clear, however, that the terms of the contract with Columbia Medical did

---

**3.** Graham testified that, if Columbia Medical had wanted to secure expedited echo services, even "30 minutes to 45 minutes," he would have done "everything" to secure the resources required to service the hospital's needs. But because Columbia Medical declined to consider expedited echo services, he lacked the resources to guarantee expedited response times.

not obligate him to obtain the resources to be able to respond in less than two hours. Graham testified that he would always come as quickly as he possibly could, but he was not obligated to do so and, therefore, could not guarantee that he would be able to do so at any given time. Tragically for Hogue, Graham was unable to get there any earlier than he did, but that does not negate proximate cause. To the contrary, it is the lack of an effective procedure for getting these critical services on a stat basis—in two hours or less, as all the experts testified was required—that supports the jury's gross negligence finding. As Dr. Schroeder stated, if he and Dr. Hecht had obtained the echo within 30 or 60 minutes, he "would have started the process to transfer" at that point, increasing the opportunity to save Hogue's life.

In sum, there is sufficient evidence to support the jury's conclusion that Columbia Medical acted with conscious indifference to an extreme risk of serious injury when it (1) elected to outsource echo services without a guaranteed response time while providing emergency services, (2) failed to communicate this limitation to its medical staff so they could consider other options to treat critical care patients, and (3) delayed obtaining the echo in spite of the serious risk to Hogue's health. Although the jury was presented with some conflicting evidence, we conclude that the jury could have resolved disputed facts in favor of the Hogues to form a firm belief or conviction that Columbia Medical breached the standard of care, that such a departure created an extreme degree of risk of serious injury, and that Columbia Medical had actual, subjective awareness but acted in a manner that exhibited conscious indifference to this risk. *Garza*, 164 S.W.3d at 621, 627 (holding that an elevated burden of proof at trial requires a correspondingly elevated standard of review); *In re J.F.C.*, 96 S.W.3d at 266.

Because we conclude that the Hogues presented legally sufficient evidence of gross negligence based on the hospital's failure to provide stat echo capability without communicating the lack of such services to the physicians and nurses, we need not reach the other bases of gross negligence the Hogues raised. We therefore affirm the court of appeals' judgment affirming the award of exemplary damages capped by the MLIIA.

We do not hold that Texas law requires all hospitals to provide all services to all patients. Different hospitals may provide some services but not others without necessarily breaching the standard of care, depending, of course, on the circumstances. The standards are established under the common law by qualified experts. In this case, the hospital knew of the "obvious" necessity for potentially lifesaving stat echo capabilities in connection with the emergency medical services it decided to provide. Notwithstanding that knowledge, the hospital failed to obtain an appropriate response time for critical support services, failed to advise the medical staff of that limitation so they could properly and timely treat patients in acute distress or transfer them to another facility, and failed to provide an effective procedure to respond appropriately to Hogue's life-threatening situation. Under those circumstances, a jury could properly conclude the hospital acted with conscious indifference.

## C. Loss of Inheritance Damages

Columbia Medical next argues that the Hogues presented insufficient evidence to support the jury's loss of inheritance damages award. The jury was asked to award loss of inheritance damages, if any, defined as "the loss of the present value of the assets that the deceased, in reasonable probability, would

have added to the estate and left at natural death to the [Hogues]." The legal sufficiency standard for loss of inheritance damages is whether there is more than a scintilla of evidence to enable a reasonable person to reach a conclusion. *See St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519–20 (Tex.2002). We resolve all disputed evidence in favor of the jury's finding, but may not disregard undisputed evidence if a reasonable jury could not. *Id.* at 519–20. Columbia Medical does not argue that inheritance damages are unrecoverable or cannot be submitted as a separate item of damages. Therefore, we review for legal sufficiency only under the charge as submitted to the jury. *See Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000).

▮▮▮▮ We previously held in *Yowell v. Piper Aircraft Corp.,* 703 S.W.2d 630, 633 (Tex.1986), and again in *C & H Nationwide, Inc. v. Thompson,* 903 S.W.2d 315, 322–24 (Tex.1994) (*superseded by statute and abrogated on other grounds by Battaglia v. Alexander,* 177 S.W.3d 893, 909 (Tex.2005)), that loss of inheritance damages may be recovered in appropriate circumstances. When loss of inheritance damages are recoverable, a plaintiff must prove that the decedent's earnings less his expenditures would have left an estate for his beneficiaries to inherit and that the beneficiaries would have outlived the decedent. *C & H,* 903 S.W.2d at 323–24; *Yowell,* 703 S.W.2d at 633. In *Yowell,* we held that there was sufficient evidence of loss of inheritance damages when the plaintiff beneficiaries valued the estate by introducing evidence as to "the decedents' salaries, expected raises, expected promotions and salary increases, earning capacities, enforced savings through pension plans, spending habits, age, health, and relationship with the wrongful death beneficiaries." 703 S.W.2d at 634. In *C & H,* we clarified that although loss of inheritance damages are allowed and are to an extent indeterminate, "the willingness of the law to accommodate some indeterminacy in assessing damages does not mean there are no limits." 903 S.W.2d at 323. If a plaintiff proves loss of inheritance damages, the beneficiary is entitled to the present value of the beneficiary's share of what the decedent's estate would have been if the decedent had died a natural death. *Yowell,* 703 S.W.2d at 633.

Columbia Medical challenges the loss of inheritance damages on three grounds. First, Columbia Medical argues that the evidence did not establish that Hogue's wife would have outlived him. Next, Columbia Medical argues that the evidence did not establish that Hogue's future earnings would have exceeded his expenditures. Finally, Columbia Medical challenges the competency of the Hogues' financial expert, Dr. Allen Self.

▮▮▮ The Hogues did not present legally sufficient evidence to support either that Hogue's wife would have outlived her husband, if he had died a natural death, or that he would have had an estate left after his passing to bequeath to his beneficiaries. To prove that Hogue's wife would have outlived Hogue, the Hogues presented evidence that she was three years younger than him, that life expectancy tables showed her outliving her husband by nearly seven years, and that the jury observed her appearance and demeanor in court. There was also testimony regarding her employment. Columbia Medical opines that this evidence is insufficient and that expert testimony was required to prove her medical condition. We will not, as Columbia Medical prompts, require proof that Hogue's wife would have no health problems in the future, but we do require at least some evidence of the beneficiary's health. *See Yowell,* 703 S.W.2d at 634 ("The plaintiffs also produced evidence of

the age and health of the wrongful death beneficiaries."). Asking a jury to ascertain Hogue's wife's health based on her age or from simply observing her in court is not sufficient.

■■■ There was also insufficient evidence to prove the present value of what Hogue's estate would have been at his natural death. The jury awarded Hogue's wife $306,393 in loss of inheritance damages, the figure advanced by the Hogues' expert, Dr. Self. Dr. Self testified that in arriving at the lost inheritance damages, he considered, *inter alia,* Hogue's savings accounts, stock portfolio, equity in the marital home, and estimated future earnings based on past earnings and work expectancy tables. While this evidence goes a long way toward proving loss of inheritance damages, to the extent they are recoverable, it does not cross the finish line under *Yowell* and *C & H.*

*Yowell* and *C & H* emphasize that in arriving at the present value of the decedent's estate, the figures used in the analysis must be specific to the decedent. *See C & H,* 903 S.W.2d at 323; *Yowell,* 703 S.W.2d at 634. Some of the data Dr. Self utilized in his economic calculation came from Hogue's past work history, earnings, and savings. However, Dr. Self's work expectancy age of seventy years old, from which he calculated Hogue's remaining years in the workforce, did not account for the additional factors of Hogue's health after his operative procedure (had it been successful), post-operative recuperation time, or likely future medical expenses. Instead, Dr. Self based his calculations on an "average person," and he extracted a working expectancy of seventy years old from the work expectancy table. Thus, Dr. Self's calculations improperly failed to account for the health of the decedent. *See Yowell,* 703 S.W.2d at 634.

Moreover, figures used in determining how much of Hogue's earnings would go towards family expenses were based on assumptions contrary to undisputed facts. The value of the remaining estate was based on the assumption that the Hogues' home mortgage would have been paid off before Hogue's death, leaving no mortgage payment and therefore greater discretionary income. However, Dr. Self admitted that he did not know that Hogue's wife was still making monthly mortgage payments on the home or that at Hogue's passing, the Hogues were building a new home. Importantly, Dr. Self's analysis did not consider the impact of a new home on the family's finances in terms of equity or cost. For the reasons stated above, we hold that there was insufficient evidence to support the jury's award of loss of inheritance damages.

### D. Pre- and Postjudgment Interest

The final issue on appeal is the rate of pre- and postjudgment interest applicable to the judgment. Pursuant to Texas Finance Code section 304.103, prejudgment interest is awarded at the same rate as postjudgment interest. For that reason, we will refer to the pre- and postjudgment interest rates collectively as "interest rate."

House Bills 2415 and 4 lowered the floor interest rate to five percent from ten percent, and the ceiling interest rate to fifteen percent from twenty percent in subsections (c)(2) and (c)(3), respectively, of Texas Finance Code § 304.003, effective September 1, 2003. Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 2(a), 2003 Tex. Gen. Laws 2097; Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 6.04, 2003 Tex. Gen. Laws 862, 899. *See also BIC Pen Corp. v. Carter,* 251 S.W.3d 500, 510 (Tex.2008). The amendments applied to final judgments that are "signed or subject to appeal on or

after the effective date of this Act." § 2(a), 2003 Tex. Gen. Laws 2097; § 6.04, 2003 Tex. Gen. Laws 862. The trial court signed the amended final judgment in this case on December 3, 2002, before the effective date. However, Columbia Medical argues that the amendments apply because the case was "subject to appeal" on or after the amendments' effective date.

In interpreting section 304.003 of the Texas Finance Code, we " 'determine and give effect to the Legislature's intent' " from the plain and common meaning of the statute. *McIntyre v. Ramirez,* 109 S.W.3d 741, 745 (Tex.2003) (quoting *Tex. Dep't of Transp. v. Needham,* 82 S.W.3d 314, 318 (Tex.2002)). The Court must not interpret the statute in a manner that renders any part of the statute meaningless or superfluous. *City of Marshall v. City of Uncertain,* 206 S.W.3d 97, 105 (Tex.2006) (citing *City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 29 (Tex. 2003)).

Columbia Medical's plain language argument rests on its assertion that if the Legislature had wanted to limit applicability of the amendments to judgments "capable of being appealed," the Legislature would have used those words. Under Columbia Medical's logic, therefore, courts must apply the amended section 304.003 to every case in the trial court or the appellate process as of the amendments' effective dates. This interpretation is too broad.

Columbia Medical argues that the phrase "subject to appeal" essentially means "pending on appeal," thereby reducing the interest award. Under this position, the amendments would apply to all cases pending in the trial court and lower courts of appeals on the amendments' effective date. The Hogues counter that the amendments only apply to judgments that became appealable after the effective date of the amendments.

The plain and ordinary meaning of "subject to appeal," when modifying a judgment, is "capable of being appealed," whether that is a final judgment disposing of all parties and issues or an interlocutory appeal. Hosts of other statutes also indicate that the plain and common meaning of "subject to appeal" is capable of being appealed. *See, e.g.,* TEX. BUS. & COM.CODE § 15.10(j) ("Any final order is subject to appeal."); TEX. CIV. PRAC. & REM.CODE § 36.002(a) (applying section 36 to a foreign country judgment that is final where rendered "even though an appeal is pending or the judgment is subject to appeal"); TEX. EDUC.CODE § 28.0214(b) (declaring a school district board of trustees' determination as to grades not "subject to appeal"); TEX. FAM.CODE § 52.015(c) (making a directive to apprehend a child not "subject to appeal"); TEX. HUMAN RES.CODE § 36.101(m) ("[A] final order issued by a district court under [the section dealing with attorney general action investigation of Medicaid fraud] is subject to appeal to the supreme court."). Interpreting the plain and common meaning of "subject to appeal" to mean "on appeal" instead of "capable of being appealed" renders the above examples absurd. *See Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.,* 145 S.W.3d 170, 177–79 (Tex.2004).

Therefore, contrary to Columbia Medical's urging, we interpret the plain language of House Bills 2415 and 4 to apply section 304.003 to judgments that became final after their effective dates. In doing so, we apply the plain and common meaning of the words "subject to appeal." Because the appeal of the judgment in this case could not have been initiated after the effective dates of the amendments, House

Bills 2415 and 4 do not apply. We affirm the court of appeals on this point.

## III. Conclusion

Although we have serious reservations about the trial court's decision to trifurcate the trial, we affirm the court of appeals' holding on the contributory negligence issue because Columbia Medical did not raise a fact question on causation necessary to support the submission of the question to the jury. We affirm the award of actual damages and gross negligence damages awarded to the Hogues because the proffered evidence satisfies the standard for recovery. We reverse the portion of the judgment awarding loss of inheritance damages. Finally, we affirm the court of appeals' holding that the 2003 amendments to Texas Finance Code section 304.003 do not apply to cases that were either actually appealed or capable of being appealed before the amendments' effective dates.

Justice BRISTER filed a concurring opinion, in which Justice MEDINA joined.

Justice GREEN filed an opinion concurring in part and dissenting in part, in which Justice HECHT joined.

Justice BRISTER, joined by Justice MEDINA, concurring.

I join the Court's opinion. But I would be clearer about the "trifurcation" of this trial into three parts: (1) ten days of evidence, two days of arguments, and a verdict on the hospital's negligence, followed by (2) one more day of arguments and a second verdict on exemplary damages, and finally (3) further arguments and a third verdict on the plaintiff's contributory negligence. Rather than merely expressing "serious reservations" about this "unusual" procedure, I would say "Don't do it."

Bifurcation is proper in a few instances,[1] but no one appears to have ever bifurcated the plaintiff's negligence from the defendant's negligence as the trial court did here. Trial on these two issues cannot be severed; a jury cannot decide whose negligence (if any) caused an occurrence without knowing what both did. Nor can a jury apportion fault between two parties until it finds both negligent.[2] Whenever there is evidence that both parties are negligent, it is hard to imagine any circumstances in which a trial judge could properly bifurcate the trial of these issues and ask a jury about them separately.[3]

Since 1973, we have required broad-form jury questions because the complexity of granulated questions threatened to make the jury system unworkable.[4] We reformed jury submission practice so that questions would be submitted "logically,

---

1. *See, e.g.,* Tex. Civ. Prac & Rem.Code § 41.009 (allowing defendants to opt to bifurcate trial on exemplary damages); *Baker v. Goldsmith,* 582 S.W.2d 404, 409 (Tex.1979) (allowing bill-of-review to be tried separately from underlying case).

2. *See* Tex. Civ. Prac. & Rem.Code § 33.003; Tex.R. Civ. P. 277.

3. *See, e.g., Otis Elevator, Co. v. Bedre,* 776 S.W.2d 152, 153 (Tex.1989) (holding court of appeals erred in remanding issue of defendant's negligence but not plaintiff's); *Elbaor v. Smith,* 845 S.W.2d 240, 251 (Tex.1992) (holding trial court erred in failing to submit issue of plaintiff's negligence as well as defendant's).

4. *See Yarborough v. Berner,* 467 S.W.2d 188, 193 (Tex.1971) ("The present practice of separate submission of [granulated] issues has been the author of much confusion and mischief, has unduly complicated the special issue system, and has, on occasion, smothered what otherwise would be a simple submission under the special issue system."); *Lemos v. Montez,* 680 S.W.2d 798, 801 (Tex.1984); *see also* Tex.R. Civ. P. 277 ("In all jury cases the court shall, whenever feasible, submit the cause upon broad-form questions.").

simply, clearly, fairly, correctly, and completely."[5] But submitting the negligence of two parties in separate questions at different points in the trial is not logical (as the two are related), simple (as two sets of arguments and deliberations are required), clear (as the fault question is asked twice), fair (as someone must go last), correct (as there is no precedent for this), or complete (as the charge is split in half). Granulated questions are frustrating and confusing enough when they appear in a single charge; they are surely much more so if given to jurors at different times.

The record reflects the trial court "trifurcated" this case because, after initially finding no evidence of contributory negligence (correctly), he decided to submit the question nonetheless as a "bill" in case an appellate court disagreed. But a jury question should be submitted if the evidence supports it and refused if the evidence does not; it cannot be halfway submitted as an afterthought so one can have it both ways. Either party—plaintiff or defendant—is prejudiced if its issues are postponed until after the jury has decided most of the case and is ready to go home. In this case, for example, the plaintiff's counsel simply urged jurors in the third set of closing arguments to "[b]ring it to an end. Just say no, and then we can all be done with this work that you've done...."

"Our courts have always frowned upon piecemeal trials, deeming the public interest, the interests of litigants and the administration of justice to be better served by rules of trial which avoid a multiplicity of suits."[6] We should state today, as we have in the past, that we "remain resolute that piecemeal trials as a general rule should be avoided."[7] Accordingly, I would hold the trial court's "trifurcation" was erroneous. But as there was no evidence the plaintiff here was negligent,[8] the trial court's initial refusal to submit contributory negligence was correct and rendered its later error harmless.

Justice GREEN, joined by Justice HECHT, concurring in part and dissenting in part.

I respectfully dissent to the part of the Court's judgment sustaining the gross negligence damages. I join in the remainder of the judgment.

The standard for establishing gross negligence sets a very high bar for claimants to overcome. And it should. Gross negligence equates to outrageous conduct for which severe punishment is justified. And because it is punitive in nature, the evidence of gross negligence must be clear and convincing before punitive damages are recoverable. *See* TEX. CIV. PRAC. & REM.CODE § 41.003(a)(3); *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex.2004). This elevated clear and convincing standard, to have any meaning, must necessarily affect legal sufficiency review. It is not enough to simply conclude, as the Court does, that there is some evidence to support the jury's gross negligence finding without determining whether that evidence is clear and convincing. We have explained this legal sufficiency review at

---

**5.** *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex.1999).

**6.** *Iley v. Hughes*, 158 Tex. 362, 311 S.W.2d 648, 651 (1958).

**7.** *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 30 n. 29 (Tex.1994).

**8.** *Jackson v. Axelrad*, 221 S.W.3d 650, 652 (Tex.2007) ("[L]aymen generally have no duty to volunteer information during medical treatment.").

length, recognizing that "a finding that must meet an elevated standard of proof must also meet an elevated standard of review." *Sw. Bell Tel. Co.*, 164 S.W.3d at 622. Even if an appellate court determines that the supporting evidence amounts to more than a scintilla, "the finding is invalid unless the evidence is also clear and convincing." *Id.* at 621.

Although the Court recites the correct standard for gross negligence, 271 S.W.3d at 248, it does not apply that standard but instead uses some lesser standard when evaluating the evidence. *See id.* at 253 (stating that there is "sufficient evidence to support the jury's conclusion"). *But see Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 23, 26 (Tex.1994) (explaining the objective and subjective components of the test for gross negligence and holding that the evidence did not support such a finding); *see Diamond Shamrock Ref. Co. v. Hall*, 168 S.W.3d 164, 171–72 (Tex.2005) (holding that clear and convincing evidence of gross negligence did not exist); *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 231, 234 (Tex.2004) (holding that evidence did not support gross negligence). Gross negligence includes both objective and subjective elements. *Moriel*, 879 S.W.2d at 23. Objectively, when viewed from the actor's perspective, "the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others." *Id.* The risk or peril analysis "requires an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight." *Id.* A remote possibility of serious injury or a high probability of minor injury is not enough. *Qwest Int'l Communs. v. AT & T*

*Corp.*, 167 S.W.3d 324, 327 (Tex.2005). Subjectively, the actor must have had actual "awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others." *Id.* In this legal sufficiency review, we must consider whether, viewing the evidence in the light most favorable to the verdict, there was clear and convincing evidence that could have led a reasonable juror to form a firm belief or conviction that Columbia Medical was grossly negligent. *See Diamond Shamrock Ref. Co.*, 168 S.W.3d at 170.

With regard to the objective prong of the gross negligence analysis, the record fails to show by clear and convincing evidence that Columbia Medical's failure to contract for "stat" echocardiogram services, or its failure to advise the treating physicians of this limitation, posed an extreme risk of harm to its patients.[1] There is no evidence that, at the time when Columbia Medical was evaluating its need for medical diagnostic services, the hospital recognized that the lack of stat echo services would pose an extreme risk of harm to its patients. *See Moriel*, 879 S.W.2d at 23 ("If somebody has suffered grave injury, it may nevertheless be the case that the behavior which caused it, viewed prospectively and without the benefit of hindsight, created no great danger."). To the contrary, as noted in more detail below, the record shows that although Columbia Medical believed echo services to be important to its mission, it saw the need for echo services as being rare enough so as to make in-house services unnecessary. Instead, the hospital chose to contract for echo services on an as-needed basis. The Hogues do not complain about the hospital's decision to outsource echo services;

---

1. I also believe the record fails to show by clear and convincing evidence that Columbia Medical was grossly negligent for the other grounds claimed by the Hogues, but not addressed by the Court.

they asserts only that the hospital's failure to contract for immediate response times for echo services was gross negligence. But, in fact, the echo response time provided by the contractor satisfied the physicians who were responsible for ordering it.

Dr. Schroeder, who was the director of Columbia Medical's intensive care unit (ICU) as well as Hogue's treating ICU pulmonologist, ordered the echo after consulting with Dr. Lawson, a cardiologist. Dr. Schroeder testified that he ordered an echo "now" so that Dr. Lawson could review the results when he arrived at the hospital. Dr. Lawson, who believed "stat" meant "within an hour or two," suggested they "obtain an echo today, this evening, you know, so that we could assess his cardiac status," and that he and Dr. Schroeder "knew it would probably take several hours to get the echo completed." Despite the echo technician having told Hogue's nurse that it would probably take up to two hours for him to get to the hospital, Dr. Schroeder's echo order remained in place, and Hogue's treating physicians chose to wait rather than immediately transfer Hogue to another hospital, which could have been done under the hospital's policies. The echo technician arrived at the hospital about two hours after being paged and completed the study within about twenty minutes. None of Hogue's doctors complained about the delay in obtaining the echo. In fact, Dr. Schroeder testified that Columbia Medical provided the assistance and support he needed to care for Hogue.

Not only were Hogue's doctors satisfied with the availability of the echo services, but nothing in the record indicates that the results would have been available sooner had Columbia Medical prearranged for a guaranteed stat echo response time. The record shows that Hogue's echo was performed within the maximum response time available from Cardiovascular On–Call Specialists, Inc., the contractor that provided technicians to Columbia Medical for echo services. Morton Graham, the president of Cardiovascular On–Call Specialists, testified that they did not offer on-call services, to guarantee a fast response, during the hours in which Hogue's echo was ordered. Although the Court implies that Columbia Medical could have guaranteed stat echo response time during business hours by paying the on-call fee, 271 S.W.3d at 249, the record states otherwise. Graham testified that Cardiovascular On–Call Specialists "did not offer on-call services at that time between the hours of 8:00 in the morning and 5:00 in the afternoon," Monday through Friday. Graham explained that he could not guarantee staffing availability during that time because he could not afford the overhead required to employ someone who was "sitting around waiting in the hope of being called." Because he received the call for Hogue's echo during regular business hours, the on-call fee would not have been applicable. And even if the company had offered on-call services at that time and Columbia Medical had contracted for that guaranteed response time, it is undisputed that the response time for Hogue's study would not have been different because Graham responded within the company's two-hour guarantee window.[2] When asked if, under the terms of the contract with Columbia Medical, he could have done any better than a two-hour guaranteed response time, Graham responded, "No." Graham testified that, from time to time prior to the day of Hogue's echo, he had received requests to perform stat echos, and, as with Hogue's study, he was able to accomplish

2. The record indicates that Cardiovascular On–Call Specialists, Inc. did charge Columbia Medical an $85 stat fee for Hogue's echo, however.

his goal of responding within two hours. The record contains no evidence of what response times might have been available from other companies offering echo services—except that Cardiovascular On–Call Specialists' two-hour response time was comparable to that of its competitors—and no evidence that Columbia Medical could have contracted for a faster or guaranteed response time.[3] Neither Hogue's doctors nor the hospital staff acted, at the time the events occurred, in any way suggesting that the echo response time created an extreme risk of harm to Hogue.[4] We cannot now, with the benefit of hindsight, draw that conclusion. Because there is no evidence that the response time would have been different had Columbia Medical paid for on-call services or arranged for a guaranteed response time, Columbia Medical's failure to ensure faster stat echo response time does not support a finding of gross negligence.

Even if Columbia Medical's failure to ensure a guaranteed stat echo response time created an extreme risk to Hogue, the record lacks clear and convincing evidence of the subjective prong of the gross negligence analysis: that Columbia Medical was actually aware of the extreme risk and consciously disregarded it. "What separates ordinary negligence from gross negligence is the defendant's state of mind; in other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrate he did not care." *Diamond Shamrock Ref. Co.*, 168 S.W.3d at 173 (quoting *Louisiana–Pacific Corp. v. Andrade*, 19 S.W.3d 245, 246–47 (Tex.1999)). When the hospital was being established, the administration considered whether echo services should be available, and it was agreed that they should. But a market analysis projecting very low need for echocardiograms in the relatively young community the hospital would serve, and the availability of experienced, competent technicians, led Columbia Medical, with the advice of Dr. Overbeck, Chief of Medicine and a representative of the hospital's main cardiology

3. The Court states that Morton Graham would have been willing to negotiate appropriate terms if Columbia had wanted to guarantee stat echo capabilities, but that Columbia Medical was not interested in doing so. 271 S.W.3d at 249. The record, however, does not reflect this. Graham testified that he would have been interested in talking with the hospital about possibilities to get stat echos in 30 to 45 minutes, and he testified that he would have done everything he could to negotiate "something that made ... business sense," or he claimed he would have told the hospital if he couldn't accommodate it. But the trial court sustained an objection to a question asking whether it would have been feasible for Cardiovascular On–Call Specialists to provide a quicker guaranteed response time, if there had been discussions with the hospital about doing so. In fact, the trial court refused to allow "a hypothetical about could they have negotiated a different contract with a reduced response time ... opening up all terms, including, I mean, if you pay somebody a million dollars a year can you get them to do this...."

4. In fact, Dr. Schroeder testified that, despite Columbia Medical having to call in an outside technician, the risk of transferring Hogue outweighed the potential of getting faster echo results from another hospital. Dr. Schroeder believed that Hogue was not stable to transfer at that point and testified that it was more likely than not that, whether the echo was conducted then or soon after, Hogue would have died anyway. The majority cites Dr. Levitsky's testimony of a ninety percent survival chance if Hogue had been diagnosed and transferred earlier, 271 S.W.3d at 250, but Dr. Levitsky also testified that, even considering the response time, Hogue would likely have survived if he had been transferred within an hour after completion of the echo. It can hardly be said that the response time created an extreme risk of serious injury or death when even the Hogues' expert believed that, immediately following the echo, Hogue's survival chances were quite good.

group, to decide to outsource the service. The plaintiffs do not claim that outsourcing the echo procedure was in any way improper.[5] The sole complaint is that the hospital should have assured a stat response time when it was needed. The evidence is inconclusive about what a stat response time is—somewhere between thirty minutes and two hours—and whether Cardiovascular On–Call Specialists or any other echocardiogram contractor could have provided a guaranteed shorter response time if requested. The evidence shows that, until March 9, 1998, Columbia Medical believed its echo contractor, who responded to stat echo orders within two hours, was doing a "great job" and "providing a level of service that was consistent with the needs and expectations of the medical staff," and the physicians were very happy with the service provided. Even assuming that stat echo results should have been available in a much shorter time, the evidence does not establish that Columbia Medical was actually, subjectively aware that its failure to provide such a response time created a likelihood of serious injury to patients but then acted with conscious indifference toward that risk. At most, the evidence shows that Columbia Medical was negligent in not considering the risk or appreciating the danger of failing to arrange for immediate echo services, but the evidence does not establish gross negligence. Scott Montgomery, Columbia Medical's Director of Clinical Outpatient Services who negotiated the contract with Cardiovascular On–Call Specialists, testified that he was concerned about the timeliness with which echocardiograms were going to be done and was focused on making sure the contracted services would meet the needs and expectations of the hospital's physicians. That is a far cry from showing that the hospital knew, but did not care, that by not having immediate echo services, some patients would die.

Because no clear standard exists for a stat echo response time, the next point of contention is that the hospital administrators failed to make it clear to treating physicians that stat echo might not be available at the hospital, and that a patient needing it might have to be transferred to another facility. The Court focuses on expert testimony that hospitals should have guidelines for provision of contracted services, and that hospitals should communicate the limitations on services to its staff. 271 S.W.3d at 250. Although Columbia Medical's hospital administrators admitted they made no effort to inform the medical staff of the echo capabilities and potential response times, the ICU nurse manager at the time Hogue was treated at Columbia Medical testified that she was aware the hospital outsourced its echo services, that she passed that information on to all of the nurses she hired, and that the previously hired nurses "already knew." With no evidence that anything more was done to inform physicians and the medical staff about the hospital's echo capabilities, a reasonable juror could have concluded that Columbia Medical was negligent. But the evidence falls far short of showing the "black heart" required of the actor to qualify for a gross negligence finding. The hospital administrators responsible for echo services knew the medical staff had been satisfied with the existing arrangement for echo services, and Hogue's treat-

---

5. Likewise, the Court says that its holding does not require all hospitals to provide all services. 271 S.W.3d at 253. But if it takes fifteen to twenty minutes to conduct an echo, as the record in this case indicates, and if, as the Court suggests, stat echo results should be available within thirty minutes or so, it is hard to imagine how it can be reasonable any longer for a hospital to outsource its echo services.

ing physicians testified that the hospital provided the services necessary to care for Hogue. As noted, before Hogue's echo was performed, Dr. Schroeder knew that a technician would have to be brought in from off-site and assumed it would take several hours for the echo to be completed. Moreover, the nursing staff knew that a technician likely would not arrive to begin the echo for at least an hour and a half. Under these circumstances, it is not reasonable to conclude that Columbia Medical's failure to communicate to its staff that echo services were outsourced, or that stat echos were not available, exhibited conscious indifference to an extreme risk.

The Court focuses on evidence regarding appropriate stat echo response time, concluding that Columbia Medical breached the standard of care by not ensuring a shorter response time. 271 S.W.3d at 251. But the evidence is uncontroverted that no federal or state law or rule governs stat echo response times; that no published medical guidelines apply to stat echo response times; that Cardiovascular On–Call Specialists did not offer a guaranteed response time when Hogue's study was ordered; that even if Cardiovascular On–Call Specialists had offered a guaranteed response time and Columbia Medical had paid for that service, the response time for Hogue's study would not have been different; and that the medical staff at Columbia Medical had been satisfied with the echo services provided under the contract with Cardiovascular On–Call Specialists. In addition, there is no evidence that Columbia Medical could have obtained a contract from another company that would ensure a faster response time; in fact, the evidence shows that Cardiovascular On–Call Specialists' two-hour stat echo response time was consistent with what competitors provided. On appellate review, we do not disregard undisputed evidence that does not support the jury's finding because doing so could skew the analysis of whether there is clear and convincing evidence. *Diamond Shamrock Ref. Co.,* 168 S.W.3d at 170 (quoting *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex.2002)). In this case, the record fails to show the required clear and convincing evidence of a state of mind so indifferent to peril as to elevate the hospital's conduct from negligence to gross negligence.

Viewing the record in the light most favorable to the Hogues, reasonable jurors could have concluded that Columbia Medical acted with negligence, but not gross negligence. Without clear and convincing evidence to support the necessary gross negligence elements, the jury's finding must be set aside. *See Universal Servs. Co. v. Ung,* 904 S.W.2d 638, 641–42 (Tex. 1995). Because the Court fails to do so, I dissent.

