

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-14-00054-CV

IN THE INTEREST OF C.E., C.E.,
AND M.E., CHILDREN

----------

FROM THE 355TH DISTRICT COURT OF HOOD COUNTY
TRIAL COURT NO. D2013105

----------

## MEMORANDUM OPINION[1]

----------

Appellant Mother appeals from the trial court's judgment terminating her parent-child relationships with her sons, C.E. and C.E., and with her daughter, M.E.[2]  In four issues, Mother contends that termination based solely on her affidavit of relinquishment which was allegedly not executed voluntarily is not

---

[1]*See* Tex. R. App. P. 47.4.

[2]Mother's eldest son, D.F., turned eighteen before trial; he is therefore not a part of this appeal.

proper and does not comply with the family code; that the trial court's judgment should be reversed because she timely revoked her relinquishment of her parental rights under a plain reading of section 161.1035 of the family code;[3] that the application of section 161.103(e) of the family code denies her due process by providing no means of revoking her allegedly involuntary relinquishment of parental rights;[4] and that the evidence is legally and factually insufficient to support the trial court's best interest finding and finding under section 161.001(1)(K).[5] Because we hold that Mother's affidavit of relinquishment is valid and irrevocable, that the application of section 161.103(e) did not violate Mother's due process by preventing her from revoking the affidavit of relinquishment, and that the evidence is legally and factually sufficient to support the trial court's findings that termination is in the children's best interest and that Mother executed an irrevocable affidavit of relinquishment of her parental rights, we affirm the trial court's judgment.

**Background Facts**

Mother signed a mediated settlement agreement (MSA) and an irrevocable affidavit of relinquishment before trial. In the MSA, the Texas Department of Family and Protective Services (TDFPS) and Mother agreed that Mother would

---

[3]Tex. Fam. Code Ann. § 161.1035 (West 2014).

[4]*Id.* § 161.103(e).

[5]*Id.* § 161.001(1)(K), (2).

owe no past or future child support for the children and that TDFPS would seek adoption of all the children first by the daughter's foster parent and alternatively by the sons' former foster parent. In her "Affidavit of Voluntary Relinquishment of Parental Rights to the Department of Family and Protective Services," Mother stated under oath that

- she was presently obligated to pay child support;

- she had been told of and understood her parental rights and duties as set out in the family code (and they were also listed in the affidavit);

- "[t]ermination of the parent-child relationship is in the best interest of the children";

- "by naming the Department of Family and Protective Services as managing conservator in this Affidavit of Relinquishment, [she gave] up all [her] parental rights and grant[ed] them to the Department and/or to the adoptive parents with whom [the] children may be placed";

- she "designate[d] the Department of Family and Protective Services . . . managing conservator of the children"; and

- she "freely, voluntarily, and permanently g[a]ve and relinquish[ed] to the Department all [her] parental rights and duties" and "consent[ed] to the placement of the children for adoption or in substitute care by the Department or by a licensed child-placing agency."

Information about the nature of the affidavit of relinquishment was set out in bold in two separate places in the document. Mother swore under oath:

7. **Affidavit of Relinquishment Irrevocable**

**"This Affidavit of Relinquishment of Parental Rights is and shall be final, permanent, and irrevocable. I fully understand that, if I change my mind at any time, I can never force the agency to destroy, revoke or return this affidavit.**

3

. . . .

**9. Acknowledgment of Receipt and that Affidavit is Irrevocable**

**"I fully understand that this affidavit, once signed, is irrevocable, and I will not be further informed of any hearings or proceedings affecting the children named in this affidavit, including any termination suit.**

**"I have received a copy of this Affidavit of Relinquishment at the time of signing."**

After a brief trial, the trial court terminated Mother's parental rights to the children based on her affidavit of voluntary relinquishment and the trial court's best interest finding. Five days later, the trial court received Mother's letter seeking to revoke her affidavit. She also timely filed a motion for new trial alleging that she had signed the affidavit of relinquishment under duress and because of undue influence. Mother stated in her motion for new trial that

> [o]nly after [she] was led to believe that the father had signed an affidavit of relinquishment, that her mother-in-law supported the termination[,] and that her children wanted her to allow them to be adopted[] did she agree to sign the affidavit. Mo[ther]'s acquiescence to the termination was a direct result of the undue influence of the mediation participants. Without the influence of those persons at mediation, and without being misinformed of crucial facts during mediation, Mo[ther] would not have signed the affidavit of relinquishment.

In her motion, Mother also requested that the trial court take judicial notice of its file. Mother's affidavit and the affidavit of the paternal grandmother accompanied her motion for new trial. After a hearing, the trial court denied Mother's motion for new trial. Mother timely appealed.

4

**Best Interest Finding**

In her fourth issue, Mother contends that TDFPS failed to prove that termination was in the children's best interests. In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit.[6] Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures."[7] We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.[8]

Termination decisions must be supported by clear and convincing evidence.[9] "[C]onjecture is not enough."[10] Due process demands this heightened standard because "[a] parental rights termination proceeding

---

[6]Tex. Fam. Code Ann. § 161.206(b) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

[7]*In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).

[8]*In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

[9]Tex. Fam. Code Ann. §§ 161.001, 161.206(a) (West 2014); *E.N.C.*, 384 S.W.3d at 802.

[10]*E.N.C.*, 384 S.W.3d at 810.

encumbers a value 'far more precious than any property right.'"[11]   Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."[12]

For the trial court to properly terminate the parent-child relationship, TDFPS needed to establish by clear and convincing evidence that Mother "executed before or after the suit [was] filed an unrevoked or irrevocable affidavit of relinquishment of parental rights" and that termination was in the best interest of the children.[13]   In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that Mother "executed before or after the suit [was] filed an unrevoked or irrevocable affidavit of relinquishment of parental rights" and that termination was in the best interest of the children.[14]

We review all the evidence in the light most favorable to the finding and judgment.[15]   We resolve any disputed facts in favor of the finding if a reasonable

---

[11]*E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802.

[12]Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

[13]*See* Tex. Fam. Code Ann. § 161.001(1)(K), (2); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

[14]*See* Tex. Fam. Code Ann. § 161.001(1)(K), (2); *In re J.P.B.*, 180 S.W.3d 570, 572–73 (Tex. 2005).

[15]*J.P.B.*, 180 S.W.3d at 573.

factfinder could have done so.[16]  We disregard all evidence that a reasonable factfinder could have disbelieved.[17]  We consider undisputed evidence even if it is contrary to the finding.[18]  That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not.[19]  "A lack of evidence does not constitute clear and convincing evidence."[20]

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province.[21]  And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable.[22]

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own.[23]  We determine whether, on the entire record, a factfinder could reasonably form a firm

---

[16]*Id.*

[17]*Id.*

[18]*Id.*

[19]*See id.*

[20]*E.N.C.*, 384 S.W.3d at 808.

[21]*J.P.B.*, 180 S.W.3d at 573, 574.

[22]*Id.* at 573.

[23]*In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

conviction or belief that Mother "executed before or after the suit [was] filed an unrevoked or irrevocable affidavit of relinquishment of parental rights" and that termination was in the best interest of the children.[24]

There is a strong presumption that keeping a child with a parent is in the child's best interest.[25] Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest.[26]

We review the entire record to determine the child's best interest.[27] The same evidence may be probative of both the subsection (1) ground and best interest.[28] Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include

    (A)    the desires of the child;

    (B)    the emotional and physical needs of the child now and in the future;

    (C)    the emotional and physical danger to the child now and in the future;

    (D)    the parental abilities of the individuals seeking custody;

    (E)    the programs available to assist these individuals to promote the best interest of the child;

---

[24]*See* Tex. Fam. Code Ann. § 161.001(1)(K), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

[25]*In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

[26]Tex. Fam. Code Ann. § 263.307(a) (West 2014).

[27]*In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013).

[28]*C.H.*, 89 S.W.3d at 28; *see E.C.R.*, 402 S.W.3d at 249.

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.[29]

These factors are not exhaustive; some listed factors may be inapplicable to some cases.[30] Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.[31] On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.[32]

"[A]n affidavit of relinquishment, in and of itself, can provide sufficient evidence that termination is in a child's best interest."[33]

---

[29]*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807.

[30]*C.H.*, 89 S.W.3d at 27.

[31]*Id.*

[32]*Id.*

[33]*S.H. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-13-00151-CV, 2013 WL 3013874, at *3 (Tex. App.—Austin June 12, 2013, no pet.); *see Brown v. McLennan Cnty. Children's Protective Servs.*, 627 S.W.2d 390, 394 (Tex. 1982); *Ivy v. Edna Gladney Home*, 783 S.W.2d 829, 833 (Tex. App.—Fort Worth 1990, no writ).

The TDFPS caseworker testified at trial that TDFPS received a court report after Mother tested positive, apparently for methamphetamine, while on probation, which was about to be revoked. Mother admitted to TDFPS that she was having issues with methamphetamine again. Her methamphetamine use was the reason for the removal of the children in a prior TDFPS case. In the prior case, the maternal grandmother (Grandmother) was named the permanent managing conservator (PMC), and the trial court had ordered that Mother have no unsupervised contact. We note from the clerk's record that Grandmother was named PMC in June 2011, more than two and a half years before trial. But by the time TDFPS received the probation report, Grandmother had moved to Florida, leaving the children with Mother. When the new case began, Mother avoided TDFPS for about a month but then dropped the children off at their previous foster care agency.

The TDFPS caseworker also testified that the MSA is in the children's best interest and that Mother signed an affidavit of voluntary relinquishment of her parental rights as part of that agreement. The caseworker further testified that the children could be placed in an adoptive home, are readily adoptable, and do not have any educational, psychiatric, or emotional problems that would significantly impede adoption.

The CASA worker testified that the termination of Mother's parental rights is in the children's best interest and that the daughter's foster mother is a good potential candidate to adopt all the children.

The trial court took judicial notice of Mother's affidavit of relinquishment, which provides that the children were fourteen, thirteen, and twelve years old respectively when she signed the affidavit a few days before trial. Mother also swore in her affidavit of relinquishment that "[t]ermination of the parent-child relationship is in the best interest of the children."

Thus, the trial court could glean from the evidence that Mother's life was unstable, that her probation was subject to revocation, that she had a chronic methamphetamine problem, that her children had been removed and formally placed with her mother in 2011 and that she had been limited to supervised visitation, that she had violated that order, that she had avoided CPS for a month, that the caseworker, the CASA worker, and Mother all thought that termination of her parental rights was in the children's best interest, and that the children, even at their ages, were readily adoptable with two potential placements available that were already known to the children and that would allow them to live together. Applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the trial court's best interest finding. We overrule Mother's fourth issue.

**Voluntariness of Affidavit of Relinquishment**

In her first issue, Mother contends that "[t]he trial court's order should be reversed because termination based solely under Texas Family Code § 161.001(1)(K), pursuant to an affidavit of relinquishment that was not executed voluntarily, is not proper, and does not comply with the Texas Family Code:

Texas Family Code § 161.001(1)(K) was not satisfied." While Mother also claims that the motion for new trial challenged the legal and factual sufficiency of the evidence to support the trial court's judgment, it did not. The motion for new trial was focused solely on presenting newly discovered evidence to the trial court in order to have Mother's affidavit of relinquishment set aside. Essentially, Mother challenges the trial court's denial of her motion for new trial and rejection of her arguments that her affidavit of relinquishment was involuntary. But Mother misstates the burden of proof.

We review a trial court's denial of a motion for new trial for an abuse of discretion.[34] Relevant to the facts before us, section 161.001 allows a trial court to terminate the parent-child relationship if the trial court finds by clear and convincing evidence that termination is in the best interest of the child and that the parent has "executed before or after the suit is filed an unrevoked or irrevocable affidavit of relinquishment of parental rights."[35] Section 161.103 has a list of requirements that the affidavit of relinquishment must satisfy.[36] Mother does not contend that the affidavit fails to meet the explicit statutory requirements, and our review of the affidavit yields the conclusion that it does meet those requirements. No contrary evidence was admitted at trial. To that

---

[34]*R.R.*, 209 S.W.3d at 114.

[35]Tex. Fam. Code Ann. § 161.001(1)(K), (2).

[36]*Id.* § 161.103(a)–(b).

extent and to address Mother's sufficiency complaint, we hold that the evidence was legally and factually sufficient to support the trial court's finding under subsection (K) as of the date of the judgment.[37]

But implicit in the family code is the requirement that the affidavit must be voluntarily executed.[38] An involuntarily executed affidavit is a complete defense to a termination decree based solely on such an affidavit.[39] After the proponent of the affidavit demonstrates that it complies "with the requirements of section 161.103," the party opposing it must prove, "by a preponderance of the evidence," that it "was executed as a result of fraud, duress, or coercion" to get the affidavit set aside.[40] This was the purpose of Mother's motion for new trial.

"Undue influence," "misrepresentation," "duress," and "overreaching" are the terms used by Mother in her motion for new trial to argue that her affidavit was involuntarily executed. We do not believe that her single use of "fraud" for the first time in her brief seeks to enlarge her contention below that her affidavit

---

[37]*See id.* § 161.001(1)(K).

[38]*See id.*; *see also In re D.R.L.M.,* 84 S.W.3d 281, 296 (Tex. App.—Fort Worth 2002, pet. denied).

[39]*D.R.L.M.,* 84 S.W.3d at 296.

[40]*See* Tex. Fam. Code Ann. § 161.211(c) (West 2014); *In re D.E.H.,* 301 S.W.3d 825, 830 (Tex. App.—Fort Worth 2009, pet. denied) (en banc) (citations omitted); *D.R.L.M.,* 84 S.W.3d at 297.

was involuntarily executed.[41]   Mother also contends in her brief that the MSA requirement that she execute the affidavit of relinquishment made it involuntary.

The heart of a claim of undue influence is the overcoming of a person's free will and replacing it with the will of someone else, causing the person to do something that she otherwise would not have done.[42]   Influence is not "undue" just because it is persuasive and effective.[43]   "[T]he law does not condemn all persuasion, entreaty, importunity, and intercession."[44]

> [O]verreaching is tricking, outwitting, or cheating a person into doing [something that] he would not otherwise have done.  Duress occurs when, due to some kind of threat, a person is incapable of exercising her free agency and unable to withhold consent.  Fraud may be committed through active misrepresentation . . . and is an act, omission, or concealment in breach of a legal duty, trust, or confidence justly imposed, when the breach causes injury to another or the taking of an undue and unconscientious advantage.  A misrepresentation is a falsehood or untruth with the intent to deceive.[45]

Mother claimed in her motion for new trial that someone at the mediation told her (1) that the paternal grandmother thought she should sign the affidavit of relinquishment and (2) that her sons wanted to be adopted.  Mother also claimed

---

[41]*See* Tex. R. App. P. 33.1.

[42]*D.E.H.,* 301 S.W.3d at 828–29.

[43]*Id.*

[44]*B.A.L. v. Edna Gladney Home*, 677 S.W.2d 826, 830 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.).

[45]*D.E.H.,* 301 S.W.3d at 829 (citations and selected internal quotation and other punctuation marks omitted).

14

that TDFPS obtained the presumed father's signature to the MSA and affidavit of relinquishment first because TDFPS somehow knew that that would persuade her to sign the affidavit of relinquishment. Mother's affidavit attached to her motion for new trial supported her allegations in the motion. In the paternal grandmother's affidavit, also filed in support of the motion for new trial, the paternal grandmother states that she never said that Mother "sign[ing] over her rights" to the children was best for them.

In Mother's lawyer's opening statement at the hearing on the motion for new trial, he contended that she would not have signed the MSA or affidavit had undue influence not been exerted on her.

Mother testified at the hearing on her motion for new trial that she placed the children with the Lifeline agency because she knew that she "was going to have to be incarcerated." She admitted that she had participated in mediation but acknowledged that she had alleged that "things happened in mediation that . . . caused [her] to do things that [she] would not have otherwise done." She testified that she wanted to testify about mediation, even though it was confidential, and that she did so freely and voluntarily. Mother contended that she had attended mediation with the intent to go to jury trial. She claimed that she had told her trial lawyer of her intent as well as various attendees of a permanency meeting at Somervell, including her daughter. Mother admitted that her trial lawyer told "that one lady" that Mother wanted to talk to the paternal grandmother. According to Mother, the unnamed woman said,

"Well, they already think that you should go ahead and just sign over your rights. They told us that you should sign over your rights and everything, because it's in the best interests of the kids," and she was really forceful about it, like real flamboyant, you know, "Hey." And then she said, "Anyway, **your boys told me that they wanted—they told us that they wanted to be adopted**." The only reason she could say my boys was because that my daughter at the PMC meeting said she—she knows I'll do anything, she doesn't have a doubt in her mind that I'll do anything to get them back, and—and it doesn't mean—**it's just the moment I heard that my boys, you know, I thought something like that, I—I got that idea that I was, you know, the world's worst mother for a minute, you know. I couldn't quit crying. I was an emotional wreck. And—I'm sorry. Anybody that—they both knew in that room that I did not want to sign my rights over. The reason I signed my rights was because**, okay, my ex . . . was nowhere involved in the case, I mean he was on the phone and stuff and everything, but **they knew that I would not sign that paper if somebody else's signature wasn't on there, and he was bench-warranted back for the case, okay, which is understandable, I understand that he has to come to sign over his own rights, but they knew that if they pulled him out before me and I seen his signature on there, I would think that he talked to my mother-in-law, which is his mother, thinking that there was nothing else that we could do about the well-being of my children, staying with family, that there was nothing else we would be able to do, so I know that they had me follow suit with him, seeing his signature on there, me thinking that he talked to his mom and everything, them telling me that my mother-in-law thinks it's in the best interests I sign my kids over, you know, and them pulling him out and his signature being on that paper, you know, so I followed suit, I did.** Did I want to? No. These are my children, and I love them. And, you know, I—I'm sorry. I—I couldn't even concentrate, I was shaking so bad when I signed that paper and everything, any lawyer in their right mind would have said, "Wait. I think you need a little bit to think about this. Are you sure?" When Shelly Fowler walked into the room, [my trial lawyer] knew that I didn't want to sign my rights, he could have said, "Don't say another word. We'll take it to jury trial," that's what he should have said, but that's not what he said. He said—he let her do all the talking, let her bombard me, and **then the moment that I thought that my children wanted me to put them up for adoption**, he's like, "You do realize that [the first foster mother named as a potential adoptive mother] could die tomorrow or get hit by a bus, so there's no guarantee," I mean he went—I'm not

16

saying that anybody is ugly, I'm just saying that he should have told me to keep silent, once he found out what I wanted to do, once he knew what I wanted to do, but he didn't, he let—he allowed the lady to interrogate me.  [Emphasis added.]

Mother testified that "the undue influence that occurred was . . . aggressive behavior by the mediator and a misrepresentation as to what [the paternal grandmother] wanted to have happen or thought was in the best interests of the children."  The following dialogue between Mother and her postjudgment lawyer then occurred:

Q      *And you're saying that that caused your mind to change so much that you didn't take the action that you would have otherwise taken?*

*A*      *No.*

Q      Okay. Then—then what are you saying?  What are you saying, that—what effect did those elements have on you at mediation?

A      *It broke my heart, and I didn't—no mother wants to hear that their kids don't want them, you know*, and I—they couldn't get me with my daughter, because my daughter wrote me a letter that one day, and they couldn't get me with my daughter, and *they knew that I haven't talked to my boys, so I mean they—it—it—it killed me.  I mean it—ever—I mean I went—it just—it was the worst news that I ever heard.*  And then after that mediation with—and then like we went and we had to go sign the paper and everything and they all stopped and they said, "Oh, well, we're going to do it right here in the hall of the jail, and—in—in the courthouse building," instead of going into some room to sign papers and sit at a table like—they wanted to get it all done, so we crammed into the corner of a hall, and they're like, "Okay, and you know this," and [my trial lawyer] is having to hold the paper, and I'm crying and bawling, I'm sorry, any lawyer who knew what their client wanted from the get-go, it's not like any (inaudible)—

17

COURT REPORTER:     Excuse me. Repeat what you said. I didn't hear what you said.

A        Any lawyer that knows what their client wants ain't just going to voluntar[il]y hold the paper and say, "Here, go ahead and sign your life away," you know, I mean you know that's not what I wanted, I'm bawling, I can't even—I can't see the papers to sign the paper, you know, I mean I was so distraught, I think that I—I—I wasn't represented right, good enough, for the simple fact I think he knew—he knew I wanted to take it to jury trial, he knew that, and **they knew that they couldn't get me to sign them papers, or they knew to send somebody in before me to sign them papers, they knew. Why did it—[her ex-husband] have to be present but [another of the fathers] didn't have to be present to relinquish his rights** on his children? You know? I—I—I don't understand. [Emphasis added.]

Mother offered the MSA at the hearing, and the trial court admitted it. TDFPS stated that it had no objection. Mother testified that she signed the MSA before she signed the affidavit of relinquishment. She further testified that it provided that she would sign an affidavit of voluntary relinquishment and that she would not owe any past or future child support. She admitted that she understood that once she signed the MSA, it was binding upon her. She denied reading "the bold, capitalized, underlined section" of the MSA but testified that "it was told to [her that] if [she] signed this and saying that [she] signed over the rights to [her] kids, is how it was told to [her], and that [she] can't appeal it, and then [she] put [her] signature on it . . . [and she] initialed it." She testified that after she signed the MSA, she believed that she "had to sign" the affidavit of voluntary relinquishment. She stated that "once [she] put [her] initials on here

18

and ***once [she saw her ex's] initials on here***, [she] thought there was nothing else that [she] could do."  [Emphasis added.]

In her brief, Mother does not raise ineffective assistance of counsel at trial. The record shows that she had a lawyer during the signing of the MSA and of the affidavit of relinquishment and that she admitted at the hearing that she understood the binding nature of the MSA.  She also testified at the hearing that the statement allegedly made regarding the paternal grandmother's wishes did not compel her to sign the MSA or affidavit of relinquishment when she had not intended to do that.  Instead, she testified that the statement that the boys wanted to be adopted and the presence of the presumed father's signature on the documents were what influenced her decision.  She raised no evidence showing that the boys did not want to be adopted or that the presumed father's signature was improper or invalid.

Facing the apparent desires of her sons and the presumed father at the same time as deciding whether to terminate her rights and duties as a parent peaceably by agreement and a run-of-the-mill prove-up hearing or to gear up for a full-blown, adversarial trial understandably produced strong emotions in Mother, but the trial court could have rightfully determined that none of those influences were undue, no duress was shown, and to the extent that there was overreaching or a misrepresentation by TDFPS or the meditator, Mother by her own testimony did not rely on it in making her decision to sign the affidavit of relinquishment.  We hold that Mother did not prove fraud, duress, or coercion by

19

a preponderance of the evidence, and she therefore did not prove that her affidavit of relinquishment was involuntarily executed regardless of the MSA. Accordingly, the trial court did not abuse its discretion by denying Mother's motion for new trial. For clarity, we also point out that the evidence remained legally and factually sufficient to support termination even after the hearing on the motion for new trial. We overrule Mother's first issue.

**Irrevocability of Affidavit of Relinquishment**

In her second issue, Mother contends that the trial court's judgment terminating the parent-child relationship should be reversed because she timely revoked her relinquishment under a plain reading of section 161.1035 of the family code. Section 161.1035 provides that

> [a]n affidavit of relinquishment of parental rights that fails to state that the relinquishment or waiver is irrevocable for a stated time is . . . revocable only if the revocation is made before the 11th day after the date the affidavit is executed[] and . . . irrevocable on or after the 11th day after the date the affidavit is executed.[46]

It is true that Mother's letter to the trial court would have been timely to revoke her affidavit if section 161.1035 controlled this case. But section 161.1035 does not apply in this case. Section 161.103(e) of the family code specifically provides that

> [t]he relinquishment in an affidavit that designates the Department of Protective and Regulatory Services . . . to serve as the managing conservator is irrevocable. A relinquishment in any other affidavit of relinquishment is revocable unless it expressly provides that it is

---

[46]Tex. Fam. Code Ann. § 161.1035.

20

irrevocable for a stated period of time not to exceed 60 days after the date of its execution.[47]

Texas Department of Protective and Regulatory Services is the prior name of TDFPS.[48] Mother's affidavit designates TDFPS as the children's managing conservator. Consequently, this case falls squarely under section 161.103(e), the more specific and therefore controlling law.[49]

Mother argues that we are to strictly construe termination statutes in favor of the parent and that a strict construction of the termination statutes in favor of the parent would allow her to revoke her affidavit under section 161.1035. But that outcome could only occur if we completely ignored section 161.103(e), something we cannot do when construing statutes.[50] We hold that the affidavit is irrevocable under section 161.103(e), and we overrule this issue.

---

[47]*Id.* § 161.103(e).

[48]*In re J.A.J.*, 243 S.W.3d 611, 612 n.1 (Tex. 2007); *In re C.C.*, No. 02-04-00206-CV, 2005 WL 1244672, at *1 n.5 (Tex. App.—Fort Worth May 26, 2005, no pet.).

[49]See Tex. Fam. Code Ann. § 161.103(e); Tex. Gov't Code Ann. § 311.026(b) (West 2013); *Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 297 (Tex. 2011); *see In re Lee*, 411 S.W.3d 445, 455 (Tex. 2013) (noting that "the specific statutory language of section 153.0071(e) trumps section 153.002's more general mandate").

[50]*See Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 256 (Tex. 2008) ("The Court must not interpret the statute in a manner that renders any part of the statute meaningless or superfluous.").

**Mother's As-Applied Challenge**

In her third issue, Mother contends that section 161.103(e) as applied violates her right to due process because her affidavit of relinquishment was involuntary but that provision does not allow her to revoke the affidavit. Another provision of the family code, however, allows a parent to set aside an affidavit of relinquishment if the parent can prove by a preponderance of the evidence that the affidavit was involuntary—executed as a result of fraud, duress, or coercion.[51] We have already held that Mother failed to prove that her affidavit was involuntary in the face of TDFPS's prima facie showing. Further, a valid affidavit signed by the parent is a valid ground for involuntary termination under section 161.001(1)(K),[52] the constitutional validity of which Mother does not challenge. We overrule her third issue.

**Conclusion**

Having overruled Mother's four issues, we affirm the trial court's judgment.

PER CURIAM

PANEL: DAUPHINOT, GARDNER, and WALKER, JJ.

DELIVERED: August 7, 2014

---

[51]*See* Tex. Fam. Code Ann. § 161.211(c).

[52]*See id.* § 161.001(1)(K).

22