

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

**NO. 02-15-00028-CV**
**NO. 02-15-00029-CV**


IN THE MATTER OF A.J.W.


----------

FROM COUNTY COURT AT LAW NO. 1 OF WICHITA COUNTY
TRIAL COURT NOS. 38979-LR, 38993-LR-D

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In these accelerated appeals, Appellant A.J.W. raises legal and factual sufficiency challenges to the evidence to support her court-ordered commitment for temporary inpatient mental health services and court-ordered administration of psychoactive medication and other medication. Finding the evidence legally insufficient to support involuntary commitment, we reverse both orders. *See* Tex.

---

[1]*See* Tex. R. App. P. 47.4.

Health & Safety Code Ann. § 574.106(a)(1) (West 2010) (requiring a court order for inpatient mental health services before an order to administer psychoactive medications can be issued).

## II. Factual and Procedural Background

A.J.W. is an eighty-two-year-old widow who, at the time of the hearing, had lived alone since her husband of sixty years passed away six years earlier. Prior to his death, the couple had experienced several thefts of building materials from their home. Police reports were made and inventories of the goods stolen were provided, but no one was apprehended for the crimes.

On January 9, 2015, A.J.W.'s nephew executed a sworn application for an emergency mental health detention, alleging that A.J.W. was suffering from "dillusions [sic] that there are people living in her attic that steal her guns and water." He stated that these delusions had escalated to a point where "she [was] shooting in her house," and he was concerned "for her safety and others in surrounding houses that they could be hit by gunfire." The application was presented to a magistrate who issued a warrant and ordered A.J.W.'s immediate apprehension and transport to Red River Hospital for a preliminary examination pursuant to section 573.021(c) of the Texas Health and Safety Code.

Following the final hearing on January 26, the trial court signed an order of involuntary commitment, finding A.J.W. to be

> mentally ill and that as a result of that mental illness the Patient is likely to cause serious harm to others and will if not treated continue to suffer severe and abnormal mental[,] emotional[,] or physical

2

distress and will continue to experience deterioration of the proposed patient's ability to function independently which is exhibited by the proposed patient's inability except for reasons of indigence to provide for the proposed patient's basic needs including food[,] clothing[,] health[,] or safety; and is unable to make a rational and informed decision as to whether or not to submit to treatment.

The trial judge committed A.J.W. to inpatient mental health services for a period not to exceed ninety days. The trial court also authorized the administration of medications, including antipsychotics, anxiolytics, hypnotics, sedatives, and mood stabilizers to A.J.W. over her refusal.

### III.    Discussion

### A.  Involuntary Commitment and Court-Ordered Psychoactive Medication

A trial court may order an individual involuntarily confined to receive temporary inpatient mental health services only if the judge finds, from clear and convincing evidence, that

(1)  the proposed patient is mentally ill;  and

(2)  as a result of that mental illness the proposed patient:

> (A)  is likely to cause serious harm to himself;
> (B)  is likely to cause serious harm to others;  or
> (C)  is:

>> (i)    suffering severe and abnormal mental, emotional, or physical distress;

>> (ii)   experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety;  and

3

>    (iii)    unable to make a rational and informed decision as to whether or not to submit to treatment.

Tex. Health & Safety Code Ann. § 574.034(a) (West 2010 & Supp. 2014).  If the court finds that the proposed patient meets the above commitment criteria, the court must specify which criterion forms the basis for the decision.  *Id.* § 574.034(c).

Because an involuntary commitment is a drastic measure, the statutory requirements and evidentiary standards for involuntary commitment for treatment of mental illness are high.  *State ex rel. S.W.*, 356 S.W.3d 576, 579 (Tex. App.— Texarkana 2011, no pet.) (citing *In re Breedon*, 4 S.W.3d 782, 789 (Tex. App.— San Antonio 1999, no pet.); *State ex rel. E.E.*, 224 S.W.3d 791, 794 (Tex. App.— Texarkana 2007, no pet.); *Harris v. State*, 615 S.W.2d 330, 333 (Tex. Civ. App.— Fort Worth 1981, writ ref'd n.r.e.)).  The State has the burden to establish by clear and convincing evidence that the proposed patient meets the criteria set forth in section 574.034.  *Mezick v. State*, 920 S.W.2d 427, 430 (Tex. App.— Houston [1st Dist.] 1996, no writ).  To be clear and convincing under section 574.034(a), the evidence must include "expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm: (1) the likelihood of serious harm to the proposed patient or others; or (2) the proposed patient's distress and the deterioration of the proposed patient's ability to function."  Tex. Health & Safety Code Ann. § 574.034(d).  Expert testimony is essential, *id.*, but expert diagnosis alone is not sufficient to confine a

4

patient for compulsory treatment. *Mezick*, 920 S.W.2d at 430. The State cannot meet its burden of proof without expert opinions and recommendations "supported by a showing of the factual bases on which they are grounded." *Id.* Mere evidence that an individual is mentally ill and in need of hospitalization is no evidence that the statutory standard has been met. *In re P.W.*, 801 S.W.2d 1, 2 (Tex. App.—Fort Worth 1990, writ denied).

A trial court may issue an order authorizing the administration of psychoactive medications to a patient who is under court order to receive inpatient mental health services. Tex. Health & Safety Code Ann. § 574.106(a)(1). Before the court may issue such an order, however, the court must find by clear and convincing evidence that treatment with the proposed medication is in the best interest of the patient and that the patient lacks the capacity to make a decision regarding the administration of the proposed medication. *Id.* § 574.106(a-1)(1). In making the finding that treatment with psychoactive medication is in the best interest of the patient, the court shall consider:

(1) the patient's expressed preferences regarding treatment with psychoactive medication;

(2) the patient's religious beliefs;

(3) the risks and benefits, from the perspective of the patient, of taking psychoactive medication;

(4) the consequences to the patient if the psychoactive medication is not administered;

5

(5)  the prognosis for the patient if the patient is treated with psychoactive medication;

(6)  alternative, less intrusive treatments that are likely to produce the same results as treatment with psychoactive medication; and

(7)  less intrusive treatments likely to secure the patient's agreement to take the psychoactive medication.

*Id.* § 574.106(b)(1)–(7).

## B.  Standard of Review

Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.  Tex. Civ. Prac. & Rem. Code Ann. § 41.001(2) (West 2015); *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012); *State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010).   This intermediate standard of proof falls between the preponderance standard of proof applicable to most civil proceedings and the reasonable doubt standard of proof applicable to most criminal proceedings.   *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979).   While the proof must be of a heavier weight than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed.   *Addington*, 588 S.W.2d at 570.

In evaluating the evidence for legal sufficiency, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that its finding was true.  *K.E.W.*, 315 S.W.3d at 20; *Columbia Med.*

6

*Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008). We review all the evidence in the light most favorable to the finding. *Waldrip*, 380 S.W.3d at 138; *Hogue*, 271 S.W.3d at 248. We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *K.E.W.*, 315 S.W.3d at 20; *Hogue*, 271 S.W.3d at 248. We disregard all evidence that a reasonable factfinder could have disbelieved. *Hogue*, 271 S.W.3d at 248. We consider undisputed evidence even if it is contrary to the finding. *Id.*; *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See K.E.W.*, 315 S.W.3d at 20; *Hogue*, 271 S.W.3d at 248. The factfinder, not this court, is the sole judge of the credibility and demeanor of the witnesses and the weight to be given their testimony. *See In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009); *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). We must not supplant the trial court's judgment with our own. *J.O.A.*, 283 S.W.3d at 346; *see also Barker v. Eckman*, 213 S.W.3d 306, 314 (Tex. 2006).

## C. Evidence

### 1. Certificates of Medical Examination and Other Documents

At the outset of the hearing, the trial court took judicial notice of two sworn certificates of medical examination for mental illness, as well as "the alternative treatment recommendation on file in 38979-LR and the application in 38993-LR-

7

D." While the trial court could take judicial notice that these documents were part of the court's file, because A.J.W. did not file a written waiver under section 574.034(f), the trial court could not properly take judicial notice of the truth of any allegations contained in the certificates. *Compare* Tex. R. Evid. 201 (requiring that facts not be subject to reasonable dispute in that they are either generally known within the trial court's territorial jurisdiction or capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned), *and Tschirhart v. Tschirhart*, 876 S.W.2d 507, 508 (Tex. App.—Austin 1994, no writ) (stating that while a trial court may take judicial notice that a pleading has been filed, it may not take judicial notice of the truth of the allegations in its records), *with* Tex. Health & Safety Code Ann. § 574.034(f) (stating that if the proposed patient and her attorney, by written document filed with the court, waive the right to cross-examine witnesses, the court may admit the certificates of medical examination for mental illness as evidence and make its findings solely from the certificates). Because none of these documents were admitted as evidence at trial, they cannot be considered in the determination of whether temporary mental health services or the administration of psychoactive medications should be ordered. *See* Tex. Health & Safety Code Ann. § 574.034(f).

### 2. Dr. Anderson's Testimony

#### a. Delusional Disorder

Dr. Michael Allen Anderson[2] testified at the January 26 hearing that he was treating A.J.W. for a delusional disorder,[3] the defining characteristic of which was that she had "impaired reality testing where she essentially believe[d] that people [were] living in her ceiling and stealing her electricity and water."[4] On cross-examination, Dr. Anderson admitted that he did not know if there was anybody in her attic, but he based his conclusion that A.J.W. was delusional on statements made by A.J.W.'s nephew that "there never was."[5] As further evidence of A.J.W.'s delusional disorder, Dr. Anderson testified that A.J.W. claimed to suffer from "a skin condition that has something to do with rays that are beamed down from the people that live up in the ceiling as well."

Dr. Anderson expressed his opinion that based on these delusions, A.J.W. was substantially likely to cause serious harm to others because "she's already discharged a firearm in the house at least on one occasion, shooting into the

---

[2]The parties stipulated to Dr. Anderson's qualifications as an expert in the field of psychiatry.

[3]Dr. Anderson defined a delusion as "a fixed false belief."

[4]When speaking of A.J.W.'s delusions, Dr. Anderson claimed that A.J.W. believed someone was "living in her ceiling," while A.J.W. characterized her belief to be that intruders had gained access into her attic.

[5]Dr. Anderson testified that "[A.J.W.] says that that is true, and the nephew says that it's not true."

ceiling because she thinks people are up there." Based upon his understanding of the facts, Dr. Anderson expressed fear that A.J.W. would "misinterpret whatever is happening as a potential threat to herself and could hurt someone."

To further support his opinion that A.J.W. was likely to cause substantial harm to others, Dr. Anderson pointed to the fact that A.J.W. "continues to believe that she has . . . a [concealed handgun license] and has access to weapons and believes that she should be able to protect herself against any intruder." Dr. Anderson testified that he did not know whether she held a concealed handgun license or not.

### b. Psychoactive and Other Medications

Dr. Anderson testified that A.J.W. refused to take antipsychotic medication, which, in his opinion, would substantially improve her quality of life. In addition to seeking authority to prescribe antipsychotic medications, Dr. Anderson also sought authorization to prescribe sedatives, hypnotics, mood stabilizers, and antidepressants to A.J.W. When asked why he included these additional medications, Dr. Anderson admitted that he had no medical reason at the time to request them. Nevertheless, he sought—and obtained—authority to administer them "just in case there is a depressive episode" as a part of the illness and treatment.

Dr. Anderson testified that he needed the authority to administer these medications because despite numerous attempts to explain to A.J.W. the

10

benefits and side effects[6] of the proposed medications, she continued to refuse them.  In these circumstances, according to Dr. Anderson, A.J.W.'s continuous refusal to take the recommended medication indicated that she lacked the capacity to understand the risks and benefits of the medications and to make a decision regarding the administration of the medications.

As further evidence of A.J.W.'s lack of capacity to understand and make a decision regarding medications, Dr. Anderson pointed to A.J.W.'s stated reasons for refusing.  A.J.W. refused medication because "she says she doesn't have any delusions and that there's nothing wrong with her and [she] doesn't need medication."  In Dr. Anderson's opinion, A.J.W.'s insistence that she did not need any medications because there actually was someone in her attic was further proof that she lacked capacity to make a decision.

Dr. Anderson testified that he was concerned that without these medications, she would "continue to be a danger to herself or others due to discharging firearms in the home."

### 3. A.J.W.'s Testimony

#### a. Delusional Disorder

A.J.W. not only freely admitted that she had discharged a weapon into her ceiling but also testified that she had called the police after she did it.  However, she testified that she had fired her weapon only once and only because on that

---

[6]Dr. Anderson described the potential side effects of psychoactive medications to include movement disorders and metabolic toxicity.

11

night she had heard a loud noise, believed there was an intruder in the attic, and needed to protect herself.

Contrary to Dr. Anderson's characterization of A.J.W.'s beliefs, A.J.W. did not demonstrate that she had a "fixed false belief" that there were people in her attic at the time she discharged her weapon. When the State's attorney asked, "Was there anyone in your attic?," A.J.W. responded that she did not know and that she had wanted someone to look in the attic and find out but that the police refused to investigate it.[7]

Throughout her testimony it was clear that A.J.W. was concerned about the possibility of thieves and intruders in her home. She testified about the thefts she and her husband had experienced in and around her home over the years prior to the incident in question. A.J.W. described two places in her house where someone had either broken into or could very easily break into. First, she described a "mechanical room," where the water heater and an HVAC unit were located, with a door that opened to the outside. A.J.W. testified that at some point in time, someone had "got[ten] in through [that door]." She also testified that there was an opening in the garage ceiling that provided access into the attic of her house.

---

[7]A.J.W. testified, "I don't know. They were – they refused. They never have been in my attic, not even look in it, the police. They refuse to go in the attic. I said, I need somebody to check it out."

A.J.W. testified that she had started having her groceries delivered because of recent and recurring thefts from her home. She said, "[I]t seems like every time I'd go and leave the house for just a short while, someone would get in." She described the thieves as "fast" and noted that they "always [took] something off my table." She said she called the police on many occasions to report the thefts.

A.J.W. testified that as an elderly person who lives alone, she felt that she would be an "easy target" for someone who wanted to break into her home. A conversation with her daughter reinforced this belief. According to A.J.W., her daughter said to her, "Mother, you've got three things against you: you're older[,] you live alone[,] and you're a woman."

Even though the police refused to search the attic on her behalf, A.J.W. testified that at some point in time she shared her concerns with her grandson and he offered to investigate the attic for her. When he got up there, he found "some bottles, you know, glass, empty water bottles and some wrappers of food, which, you know, they weren't there before."

According to A.J.W., she obtained a concealed handgun license sometime after her husband died. It was issued after she passed her test at a gun range in Quanah, Texas. A.J.W. testified that she got the license because she believed that she should be able to use force to protect herself against someone who

13

intrudes into her house.[8]  And, according to A.J.W., that is exactly what she did on the occasion in question.

A.J.W. testified that on that night, she heard a very loud noise and believed that there was someone or something in her attic.  She testified that she didn't "want to shoot it at all," but in order to protect herself against perceived intruders—which she believed she had a right to do—she fired her weapon into the attic.  The gun she fired was a .22 pistol, which had originally belonged to her husband.  She testified that it is the only gun she owns.  According to A.J.W., this was the one and only time she had ever fired a gun into her ceiling.

### b.  Psychoactive and Other Medications

With regard to medications, A.J.W.'s testimony demonstrated her long-standing reluctance to take prescription medication and medical treatment.  In fact, with the exception of annual physical exams, A.J.W. testified that the last time she received medical treatment or took any prescription medicine was more than thirty years ago when she had a hysterectomy.

A.J.W.'s testimony, however, did not demonstrate that her reluctance to accept medication or medical treatments was irrational or uninformed.  To the contrary, she demonstrated that, after consultation with her doctor, she considered both risks and benefits and made a rational decision to decline recommended treatment.  For example, when she was diagnosed with a

---

[8]A.J.W. said she never carried a gun prior to obtaining her concealed handgun license.

prolapsed pelvis, A.J.W. declined the recommended surgery after her doctor confirmed that there was some truth to the claims she had heard on television about problems associated with vaginal mesh.[9]

A.J.W. demonstrated the same approach when presented with the recommendation for psychoactive medications. When she was asked to take medications at the Red River Hospital, A.J.W. testified that she asked the nurse, "How does this make me react?" According to A.J.W., the nurse replied, "Well, it's for mood, and it'll make you sleep," to which A.J.W. responded, "I don't have any trouble sleeping if I don't have the noises." A.J.W. testified that if it were proven to her that she needed to take medication, she would do so, but she did not agree that she was suffering from delusions.

## D. Analysis

We begin with the fundamental premise that a government cannot lock up a person against her will in order to avoid public unease or because a person is different or socially eccentric. *O'Connor v. Donaldson*, 422 U.S. 563, 575, 95 S. Ct. 2486, 2494 (1975). Not even a finding of actual mental illness, without more, can justify involuntary deprivation of a person's physical liberty. *Id.* at 575–76, 95 S. Ct. at 2493–94. The United States Constitution simply prohibits such over-reaching on the part of the state. *Id.* at 576, 95 S.Ct. at 2494.

---

[9]A.J.W. testified that she told her doctor at that time, "Can you see me going through a major operation like that at my age and no better outlet of thinking that it will work?"

15

For this reason, the evidentiary standards for involuntary commitment are high, *E.E.,* 224 S.W.3d at 794; *Harris*, 615 S.W.2d at 333, and the burden is on the State to prove not only mental illness but also some act or acts on the proposed patient's part that tend to confirm the likelihood of serious harm occurring to herself or others or the existence of distress and deterioration of the proposed patient's ability to function. Tex. Health & Safety Code Ann. § 574.034(d). The State must meet this burden of proof to a clear and convincing standard. *Id.*; *State ex rel. L.H.*, 183 S.W.3d 905, 909 (Tex. App.— Texarkana 2006, no pet.).

The trial court in this case found that A.J.W. was mentally ill, that there was a likelihood that she would cause serious harm to others, and that she had distress and deterioration in her ability to function. Although the court did not make a specific finding regarding any overt act or pattern of behavior, the only overt act that finds support in the record of this case is A.J.W.'s discharge of her .22 pistol into her ceiling. A.J.W. challenges the factual and legal sufficiency to support these findings.

### 1. Delusional Disorder

Dr. Anderson testified that A.J.W. had a delusional disorder manifesting itself in a fixed false belief that there were people in her attic, but he did not know whether there were actually intruders in A.J.W.'s attic on the occasion in question. If there were, and that is why A.J.W. fired the gun into the ceiling, then A.J.W.'s belief was not a delusion.

16

Dr. Anderson assumed that no one was in the attic, and he based that assumption upon A.J.W.'s nephew's contention that "there never was" anyone in the attic. Dr. Anderson did not explain how he obtained the nephew's version of the events or whether he had spoken to him personally.

There is no evidence in the record establishing that the nephew was present in A.J.W.'s home at the time she claimed there was someone in her attic. There is nothing in the record even establishing the nature and degree of relationship or contact that existed between A.J.W. and her nephew such that the nephew would be knowledgeable about any of the facts in this case. All that is known about the nephew from this record is that he did not live with A.J.W.

A.J.W. testified that a person could gain access to her attic through an opening in the ceiling of her garage and that she heard a loud noise from the attic. She also testified that her grandson had investigated the attic on an earlier occasion and had found empty water bottles and food wrappers up there. She further testified that although she asked the police officers to check her attic on that evening, they refused to do so.

When questioned about that evidence, Dr. Anderson said that there had been multiple people in the attic who could have left the water bottles and food wrappers, including an electrician, but he provided no basis for his knowledge on that point.

The State argues that "no individuals have been found living in her attic," but this argument misplaces the burden of proof. The burden is not on A.J.W. to

17

prove that there were intruders in her attic that evening. The burden is upon on the State to prove that A.J.W. suffered from a delusional disorder, i.e., that she had a fixed false belief that someone was in her attic, when, in fact, no one was there. If anyone investigated A.J.W.'s claims that evening and came up empty-handed, that evidence does not appear in this record.

While Dr. Anderson's opinion that A.J.W.'s expressed belief that there were people in her attic was a delusion may constitute some evidence that she suffered from a delusional disorder, such evidence is meager at best and certainly does not rise to the level of clear and convincing proof.

Dr. Anderson also expressed disbelief with regard to A.J.W.'s claim that she had a concealed handgun license,[10] although it is difficult to determine from the record the significance Dr. Anderson placed on this claim. The record is unclear as to whether Dr. Anderson thought this evidenced a delusion or a likelihood to cause serious harm to a third person.[11] Either way, he admitted that he did not know whether she actually had a concealed handgun license. Because there is no evidence in the record that A.J.W. did not, in fact, possess a

---

[10]Dr. Anderson testified that she "continues to believe that she has . . . a CHL."

[11]Although Dr. Anderson's phrasing seemed to imply that A.J.W.'s belief that she had a concealed handgun license was a delusion, his mention of A.J.W.'s claim was in response to questioning about whether she was likely to cause serious harm to others.

concealed handgun license, Dr. Anderson's testimony on this point cannot support a finding of delusional disorder.

Finally, Dr. Anderson testified that A.J.W. believed she was suffering from a skin condition caused by rays beaming down from the people in the attic. A.J.W. was not questioned about this, nor did she testify that this was her belief. Nevertheless, as the sole judge of the credibility of the witnesses, the trial court could have reasonably formed a firm conviction or belief that the allegation of mental illness, specifically, a delusional disorder, was true based on Dr. Anderson's testimony on this point alone. *H.R.M.*, 209 S.W.3d at 108; *J.O.A.*, 283 S.W.3d at 346.

## 2. Likelihood that A.J.W. Will Seriously Harm Others

Mental illness, without more, cannot justify compulsory confinement against an individual's will. *O'Connor*, 422 U.S. at 573–76, 95 S. Ct. at 2492–94. To deprive A.J.W. of her liberty, the State must offer evidence showing a recent overt act or a continuing pattern of behavior which tends to confirm (a) the likelihood that A.J.W. will seriously harm herself or others or (b) A.J.W.'s distress and the deterioration of her ability to function. *See* Tex. Health & Safety Code Ann. § 574.034(d).

Just as A.J.W. had no burden to prove that she was not delusional, she was not required to prove that she posed no danger to herself or others. Likewise, A.J.W. had no burden to prove that she was not distressed or had no deterioration in her ability to function. The State alone carries the entire burden

19

and must carry such burden to the degree that the fact-finder could form a firm belief or conviction in the truth of the allegations. *K.E.W.*, 315 S.W.3d at 20.

There is no evidence in the record of any "continuing pattern of behavior" that is likely to cause harm to A.J.W. or others.[12] There is nothing in this record that A.J.W. was distressed and that her ability to function had deteriorated.[13] The court made no finding of a likelihood that A.J.W. will seriously harm herself. That leaves only one remaining ground on which the State could rely to meet the statutory requirements to obtain court-ordered confinement: a recent overt act which tends to confirm the likelihood that A.J.W. will seriously harm others. *See* Tex. Health & Safety Code Ann. § 574.034(d)(1).

The overt act is, of course, A.J.W.'s act in firing her .22 pistol into her ceiling.

With regard to proving that one act of firing a gun into a ceiling tended to confirm the likelihood that A.J.W. would seriously harm others, Dr. Anderson's testimony tracked the language of section 574.034. However, in order to support the forced confinement of a person against her will, both constitutional and

---

[12]The record contains evidence of only one instance when A.J.W. discharged her firearm.

[13]When asked whether A.J.W. has experienced deterioration of her ability to function, Dr. Anderson replied, "She also says that she has a skin condition that has something to do with rays that are beamed down from the people that live up in the ceiling as well." While A.J.W.'s belief may very well constitute a delusion, Dr. Anderson failed to explain how this delusion constituted an act or pattern of behavior tending to confirm a deterioration in her ability to function.

20

statutory considerations require that expert testimony do more than simply recite the criteria. *S.W.*, 356 S.W.3d at 580. In these cases, expert opinion must be supported by the factual bases on which it was grounded. *Id.*

This record demonstrates that the entire basis for Dr. Anderson's opinion that A.J.W. was likely to seriously harm others is the fact that she had discharged a weapon in her own home. In explaining the basis for his opinion, Dr. Anderson harkened back to that one bare fact, stating, "I'm afraid that she's going to continue to be a danger to . . . others due to discharging firearms in the home," and, "[S]he's already discharged a firearm in the house at least on one occasion . . . and believes that she should be able to protect herself against any intruder."

The State argues that guns are inherently dangerous, *see Int'l Armament Corp. v. King*, 674 S.W.2d 413, 422 (Tex. App.—Corpus Christi 1984), *aff'd*, 686 S.W.2d 595 (Tex. 1985), and because he offers no other reason for his opinion, Dr. Anderson's opinion appears to hinge on this principle. While the law does treat guns as inherently dangerous, *see, e.g.*, Tex. Penal Code Ann. § 1.07(a)(17)(A) (West 2011 & Supp. 2014) (defining a firearm as a "deadly weapon"), that general principle is no substitute for evidence that "tends to confirm the likelihood that [A.J.W. will] seriously harm others." *See* Tex. Health & Safety Code Ann. § 574.034(d)(1). Bare psychiatric expert opinion of a potential danger to others is insufficient to support a commitment. *In re C.O.*, 65 S.W.3d 175, 182 (Tex. App.—Tyler 2001, no pet.).

Only twice in the record did Dr. Anderson offer any further elucidation for his opinion, stating, "I'm fearful that she's gonna misinterpret whatever is happening as a potential threat to herself and could hurt someone," and, "If there were a person above you, you could potentially shoot them, I suppose, and then I - - I would also worry about ricochets or neighbors or stuff like that."[14] His testimony is less than definite in both of those instances. Dr. Anderson expressed these opinions in terms of being "fearful" that A.J.W. would hurt someone, that she "could potentially" shoot someone, and a "worry" on his part about ricochets or neighbors. These opinions fall short of the requirement that evidence "tends to *confirm the likelihood* [that A.J.W. *will*] serious[ly] harm . . . others." *See* Tex. Health & Safety Code Ann. § 574.034(d) (emphasis added). Testimony regarding fears, worries, and potentialities do not rise to the level of probability, which is required by the statute. *S.W.*, 356 S.W.3d at 582 (stating that evidence that an individual's aggressive behavior *might* invite injury falls short of evidence that serious harm is *probable*); *see also K.E.W.*, 315 S.W.3d at 24 (stating that the standard requires that the overt act be probative that serious harm to others is probable); *C.O.*, 65 S.W.3d at 181–82 (stating that expert testimony that an individual may cause serious harm to others is insufficient and that the testimony must show that individual is likely to do so); *Broussard v.*

---

[14]When asked why he believed it was dangerous for a person living alone to fire a weapon into her own ceiling, Dr. Anderson replied, "I think it is dangerous . . . [i]n case there is somebody up there." Ironically, according to Dr. Anderson, A.W.J.'s belief that somebody was up there was a delusion.

22

*State*, 827 S.W.2d 619, 622 (Tex. App.—Corpus Christi 1992, no writ) ("Bare psychiatric expert opinion of a potential danger to others is insufficient to support a commitment."); *P.W.*, 801 S.W.2d at 2 (stating that evidence that merely reflects that an individual is mentally ill and in need of hospitalization is no evidence that the statutory standard has been met when it shows only "potential" harm).

We find the evidence legally insufficient to support the trial court's finding that A.J.W. is likely to cause serious harm to others. Since the evidence is not sufficiently clear and convincing, there is no legal basis to support the commitment order. We sustain A.J.W.'s legal sufficiency challenge to the commitment order and do not reach her factual sufficiency challenge. *See* Tex. R. App. P. 47.1.

Because we find the evidence legally insufficient to support the commitment order, we likewise sustain A.J.W.'s legal sufficiency challenge to the court-ordered psychoactive and other medicines. *See* Tex. Health & Safety Code Ann. § 574.106(a)(1).[15]

## IV. Conclusion

Having sustained A.J.W.'s legal sufficiency challenge, we reverse and vacate the trial court's orders—the "Judgment-Temporary Mental Health" and "Order to Authorize Psychoactive Medication"—both signed on January 26, 2015.

---

[15]Because we have reversed the trial court's commitment order, the order authorizing psychoactive medication cannot stand. *See* Tex. Health & Safety Code Ann. § 574.106(a)(1).

23

/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

PANEL:  WALKER, MEIER, and SUDDERTH, JJ.

DELIVERED: March 26, 2015