

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00160-CV

IN THE MATTER OF M.H.

----------

FROM COUNTY COURT AT LAW NO. 2 OF WICHITA COUNTY
TRIAL COURT NO. 39564-LR-D

----------

## MEMORANDUM OPINION[1]

----------

Appellant M.H. appeals from an order authorizing the administration of psychoactive medication. In his sole issue, M.H. argues that the evidence is legally and factually insufficient to support the order. We affirm.

### Background

By an order signed on April 6, 2016, and pursuant to code of criminal procedure article 46B.073, Wise County Court at Law No. 1 ordered M.H.

---

[1]*See* Tex. R. App. P. 47.4.

committed to an inpatient mental health facility (the North Texas State Hospital) for the purpose of attaining competency to stand trial for the misdemeanor offense of criminal trespass.[2]  *See* Tex. Code Crim. Proc. Ann. art. 46B.073(b)(1) (West Supp. 2016).   On May 5, 2016, Dr. Diana Isachievici, M.D., filed an application in Wichita County Court at Law No. 2 seeking an order to authorize the administration of psychoactive medication to M.H., specifically, antipsychotics, mood stabilizers, and "anxiolytics/sedatives/hypnotics," regardless of M.H.'s refusal.   *See* Tex. Health & Safety Code Ann. § 574.104(a) (West 2010).   Among other things, Dr. Isachievici indicated in the application that she had diagnosed M.H. with schizoaffective disorder and that M.H. had refused to take the proposed medications voluntarily.   Dr. Isachievici also stated in her application that she believed that M.H. lacked the capacity to make a decision regarding the administration of psychoactive medication because he "has no insight into his mental illness and the need for pharmacological treatment.  [He] has no insight and appreciation of the consequences of his decision to refuse psychotropics."

The trial court appointed counsel for M.H., and after a hearing at which Dr. Isachievici and M.H. testified, the trial court granted the relief requested in the application and signed an order authorizing the administration of psychoactive medication to M.H., finding by clear and convincing evidence in part as follows:

[2]M.H. had received mental health treatment at the North Texas State Hospital on seventeen previous occasions.

- "[M.H.] is under a court order to receive inpatient mental health services"; and

- "[M.H.] lacks the capacity to make a decision regarding the administration of the proposed medication and treatment with the proposed medication is in the best interest of [M.H.]"

*See id.* § 574.106(a)(1), (a–1)(1) (West 2010). M.H. appealed. *See id.* § 574.108(a) (West 2010) (permitting appeal of order authorizing psychoactive medication).

## Burden of Proof and Standard of Review

Clear and convincing evidence must support orders authorizing administration of psychoactive medication regardless of the patient's refusal. *Id.* § 574.106(a–1). Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. Tex. Civ. Prac. & Rem. Code Ann. § 41.001(2) (West Supp. 2016); Tex. Fam. Code Ann. § 101.007 (West 2014); *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012); *State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010).

In evaluating the evidence for legal sufficiency, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that its finding was true. *K.E.W.*, 315 S.W.3d at 20; *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008). We review all the evidence in the light most favorable to the finding. *Waldrip*, 380 S.W.3d at 138; *Hogue*, 271 S.W.3d at 248. We resolve any disputed facts in favor of the

3

finding if a reasonable factfinder could have done so. *K.E.W.*, 315 S.W.3d at 20; *Hogue*, 271 S.W.3d at 248. We disregard all evidence that a reasonable factfinder could have disbelieved. *Hogue*, 271 S.W.3d at 248. We consider undisputed evidence even if it is contrary to the finding. *Id.*; *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See K.E.W.*, 315 S.W.3d at 20; *Hogue*, 271 S.W.3d at 248. The factfinder, not this court, is the sole judge of the credibility and demeanor of the witnesses. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

In evaluating the evidence for factual sufficiency, we determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that its finding was true. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *Id.*

**Requisite Findings**

Section 574.106 authorizes a trial court to issue an order for the administration of one or more classes of psychoactive medications to a patient who is under a court order to receive inpatient mental health services or is in custody awaiting trial in a criminal proceeding and was ordered to receive

4

inpatient mental health services in the six months preceding a hearing under the section. Tex. Health & Safety Code Ann. § 574.106(a). The court may issue the order if it finds, by clear and convincing evidence, that (1) the patient lacks the capacity to make a decision regarding the administration of the proposed medication and (2) treatment with the proposed medication is in the best interest of the patient. *Id.* § 574.106(a–1)(1). Further, the court may issue the order if (1) the patient was ordered to receive inpatient mental health services by a criminal court with jurisdiction over the patient, and (2) if the court finds, by clear and convincing evidence, (a) that treatment with the proposed medication is in the best interest of the patient and (b) the patient presents a danger to the patient or others in the inpatient mental health facility in which the patient is being treated as a result of a mental disorder or mental defect. *Id.* § 574.106(a–1)(2)(A).

**Analysis**

In his only issue, M.H. argues that the evidence is legally and factually insufficient to support the trial court's order because the State failed to prove, by clear and convincing evidence, that he presented a danger to himself or others in the inpatient mental health facility and that treatment with the proposed medications is in his best interest. *See id.*

M.H. asserts that the State was required to prove under section 574.106(a–1)(2)(A) that M.H. presented a danger to himself or others in the inpatient mental health facility. "Sections 574.106(a–1)(1) and 574.106(a–1)(2) provide alternative bases for court ordered administration of psychoactive

5

medications." *State ex rel. A.S.*, No. 12-13-00300-CV, 2013 WL 6798153, at *2 (Tex. App.—Tyler Dec. 20, 2013, no pet.) (mem. op.). Here, the trial court found, as required by section 574.106(a–1)(1), that M.H. lacked the capacity to make a decision regarding administration of medications[3] and that treatment with the proposed medications was in M.H.'s best interest. *See* Tex. Health & Safety Code Ann. § 574.106(a–1)(1). Because the trial court made these findings, there was no need to determine whether M.H. presented a danger to himself or others as required by section 574.106(a–1)(2)(A). *See A.S.*, 2013 WL 6798153, at *2. Thus, we need not address M.H.'s arguments concerning section 574.106(a–1)(2)(A). *See In re C.P.*, No. 02-14-00246-CV, 2014 WL 5409107, at *6 n.7 (Tex. App.—Fort Worth Oct. 23, 2014, no pet.) (mem. op.); *A.S.*, 2013 WL 6798153, at *2 (holding trial court was not required to make a danger-to-self-or-others finding under 574.016(a–1)(2) because it made a lack-of-capacity finding under 574.016(a–1)(1) in case where patient was subject to an order of inpatient mental health services issued under chapter 46B); *see also* Tex. R. App. P. 47.1.

M.H. also challenges the sufficiency of the evidence to support the trial court's best-interest finding. Regarding the best-interest inquiry, section 574.106(b) states the following:

---

[3]M.H. does not challenge the trial court's finding that he lacked capacity to make a decision regarding the administration of the proposed medications. *See* Tex. Health & Safety Code Ann. § 574.106(a–1)(1).

In making the finding that treatment with the proposed medication is in the best interest of the patient, the court shall consider:

(1) the patient's expressed preferences regarding treatment with psychoactive medication;

(2) the patient's religious beliefs;

(3) the risks and benefits, from the perspective of the patient, of taking psychoactive medication;

(4) the consequences to the patient if the psychoactive medication is not administered;

(5) the prognosis for the patient if the patient is treated with psychoactive medication;

(6) alternative, less intrusive treatments that are likely to produce the same results as treatment with psychoactive medication; and

(7) less intrusive treatments likely to secure the patient's agreement to take the psychoactive medication.

Tex. Health Safety Code Ann. § 574.106(b). M.H. argues the evidence was insufficient to prove that treatment with the proposed medications was in his best interest because he raised concerns regarding the first, second, third, and fourth best-interest considerations that Dr. Isachievici failed to consider. M.H. contends that had Dr. Isachievici discussed M.H.'s concerns with him, "a mutually agreeable plan between doctor and patient was certainly possible."

Dr. Isachievici, a psychiatrist at the North Texas State Hospital,[4] testified that M.H. was under a 46B court order to receive inpatient mental health services

---

[4]M.H. stipulated that Dr. Isachievici was an expert in the field of psychiatry, and the trial court recognized Dr. Isachievici as such.

and that she was treating M.H. for schizoaffective disorder, a form of mental illness in which a patient has symptoms of both schizophrenia and a mood disorder, such as bipolar or depressive disorder. She further testified that M.H. exhibited psychosis and bipolar symptoms, "specifically manic symptoms, hyper talkativeness, racing thoughts, irritability, looseness of association, and paranoia."

Dr. Isachievici recommended that M.H. be treated with antipsychotics, mood stabilizers, anxiolytics, sedatives, and hypnotics. She testified that M.H. refused to take medications voluntarily and that M.H. told her that he was off medication for three years and that he did not need to take medications because they were not necessary. M.H. thought that her "impression over what he's experiencing is not true and [that she] need[ed] to be re-educated." Dr. Isachievici believed that medication would restore M.H.'s competency to stand trial. She stated that she was not aware of any alternatives to court-ordered medications that were likely to produce the same results and that there were no less-intrusive treatments.

Dr. Isachievici testified that she had attempted to discuss with M.H. the benefits and side effects of the proposed medications but that M.H. was not interested in hearing what she had to say and was "very intrusive, difficult to interrupt." Dr. Isachievici believed that M.H. lacked the capacity to make his own decisions regarding the administration of medications and that the medications were in M.H.'s best interest.

8

Dr. Isachievici further testified that hospital staff documented in M.H.'s progress notes that he stated that he needed to leave the hospital and would kill people if needed or if God told him to do so. He declared, "If God wants . . . he uses me as an instrument to kill people and then that is right and that feels good. They are after me[,] and I need to get out of here, I will kill people." A nurse also noted that when she tried to redirect M.H., he threatened to urinate in a cup and throw it at her. Dr. Isachievici admitted on cross-examination that the notes did not say that M.H. had attempted to carry out these threats or had taken any effort or actions towards causing injury or danger to another person because staff intervened. M.H. was never given emergency medication for his behavior. However, Dr. Isachievici viewed M.H.'s threats as a risk that he might possibly harm someone, and she very much believed that medications were likely to alleviate the risk of threats or any future harm that might result from threats.

Dr. Isachievici attempted to talk to M.H. about the risks associated with the proposed medications, but she could not "get that far with him" because he would not let her talk, kept talking over her, and kept interrupting her. She did inform him that the medications would benefit him because they would help him regain competency to stand trial even though M.H. disagreed that he lacked competency. When Dr. Isachievici attempted to discuss the medications with M.H., he did not express any objections to the proposed medications, much less religious objections or concerns that he might become addicted to them. M.H. did not ask Dr. Isachievici any questions about the medications. The only

9

response she received from M.H. was that he had been off medications for three years and that he did not need them. Dr. Isachievici admitted that during her testimony that M.H. never interrupted her, shouted out, or impulsively responded to her testimony.

M.H. testified that he did not want to take the medications that Dr. Isachievici wanted to give him. M.H. stated that Dr. Isachievici did not discuss the risks associated with the medications and that he did not have the opportunity to discuss his concerns and objections to them with her even though he wanted to do so. He felt that his complaints and input were ignored, and he wanted them heard. He further testified that he had concerns regarding the addictive qualities of the drugs:

> I don't need to lose time by going into meals and have Dr. Malone[5] step me off of Zyprexa or Klonopin. Klonopin is horrible. I don't want any sleep disrupts. I'm not much of a sleeper anyway. I don't need a lot of sleep or like it a lot of times but I do need some, and Klonopin withdrawals immediately would be something that would have me sleepless and then I wouldn't make decisions good.

M.H. stated that he had taken some of the proposed medications before and when asked if he had suffered any bad reactions to them before, he said, "[e]xtreme in some cases to the Haldol tranquilizers, extreme." According to M.H., he wanted to talk with Dr. Isachievici about this drug reaction, but he was not able to do so for the reason that "[s]he overrode [him] because she had a posse."

_____

[5]The record does not reflect who Dr. Malone is.

10

M.H. stated that he was a religious person and that he had religious objections to hypnotics:

> It takes the -- the pharmacological aspects of it to a control bordering -- tearing up the mind down and overriding my will. My will shouldn't be violated. My will is violated if it was a direct hypnosis, post hypnosis command; that equates in the [B]ible to witchcraft. Death penalty crime for the [T]orah circumstances. You don't remove people's will in a way right there where they don't know their thoughts and somebody else's thoughts commanding them. So hypnotics scare me because I don't like hypnosis.

M.H. stated that he did not have the opportunity to discuss his religious concerns with Dr. Isachievici.

M.H. also stated that he had preferences regarding which medications he took and that he did not feel that mood stabilizers were in his best interest. He was only able to talk to the nurses about his preferences because he only saw his doctor in "treatment team." He wanted to talk to Dr. Isachievici regarding his preferences.

When asked if Dr. Isachievici discussed the consequences of taking and not taking of the medications, M.H. responded:

> No. Really kind of more an announcement to the whole treatment team, looking around for someone to back her in the affirmation. She was looking for affirmation from everybody there that she's the professional and I'll benefit and that I'll become competent.
>
> I'm sitting there going I'm competent enough to plead no contest as I already had, and they're using the system to throw me up here, so that when I come back, I'll gather up my stuff and leave. Done deal. Done deal. I can't fight all of them there. If they're that racist, I don't want to be in that community.

11

M.H. complained that he felt like his complaints and input had been ignored and that he wanted his complaints and input to be heard. He also stated that he was willing to consider lesser and greater alternatives as to his medications and treatment.

On cross-examination, when M.H. was asked which of the proposed medications he had experience with, M.H. responded,

> As negative experiences? Depakote, valproic acid, Lithium. I don't have a Bipolar disorder is my reason for not wanting them. I exhibit, because for sometimes being in jail cells for -- in isolation for several months, when I come out –
>
> . . . .
>
> -- I'm like frantic in my speech seems pressured
>
> . . . .
>
> -- and I want to override everyone and just get my say up because I've not been heard by anybody except bang, bang, let me out of the jail.

M.H. admitted, however, that he did not have experience with all of the medications in each proposed class of medications and could not say that they all affected him negatively.

M.H. confirmed that he had not hurt anyone since being admitted to the hospital, but he admitted that he threatened to throw urine at a nurse, even though he never actually did so. M.H. stated that he had the capability to hurt others if needed and was trained by the "Israeli defense forces" and "the Nobel system self defense."

12

Viewing the evidence in the light most favorable to the trial court's best-interest finding, we hold that the trial court could have reasonably formed a firm belief or conviction that treatment with psychoactive medication was in M.H.'s best interest. The trial court found that M.H. lacked the capacity to make a decision regarding the administration of the proposed medications. "Capacity" means a patient's ability to (1) understand the nature and consequences of a proposed treatment, including the benefits, risks, and alternatives to the proposed treatment, and (2) make a decision whether to undergo the proposed treatment. Tex. Health & Safety Code Ann. § 574.101(1) (West 2010). In light of the trial court's finding regarding M.H.'s lack of capacity—which M.H. does not challenge on appeal—and M.H.'s disjointed and sometimes rambling testimony, the trial court could have considered but disregarded M.H.'s preferences regarding treatment with psychoactive medication, his religious beliefs, and the risks and benefits of taking the medications from his perspective.

Further, Dr. Isachievici testified that the proposed medications were in M.H.'s best interest, would help him regain competency to stand trial, and would alleviate the risk that he might harm someone. She also testified that there were no alternative, less-intrusive treatments likely to produce the same results as psychoactive medication and no less-intrusive treatments likely to secure M.H.'s agreement to take the medications. Applying the applicable standards of review,

13

we conclude the evidence was legally and factually sufficient to support the trial court's best-interest finding. We therefore overrule M.H.'s only issue.[6]

## Conclusion

Having overruled M.H.'s sole issue, we affirm the trial court's order authorizing psychoactive medication.

/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DELIVERED: August 19, 2016

---

[6]M.H. further argues that the trial court should not have granted Dr. Isachievici's application because it was insufficient on its face for the reason that it was signed and filed before the order committing M.H. to an inpatient mental health facility was signed. The record shows that the order committing M.H. to an inpatient mental health facility was signed on April 6, 2016, and the application was signed and filed on May 5, 2016. Thus, the application was not insufficient on its face.